UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN C. RUIZ BUENO, III, et al.,

      Plaintiffs,

                                    Case No. 2:12-cv-00809

    v.                           JUDGE GREGORY L. FROST
                                      Magistrate Judge Terence P. Kemp

ZACK SCOTT, et al.,

      Defendants.

**OPINION & ORDER**

This matter is before the Court for consideration of Defendant Douglas Edgington's motion for judgment on the pleadings (ECF No. 137), Plaintiff's memorandum in opposition (ECF No. 146), and Defendant Edgington's reply (ECF No. 151).  For the reasons that follow, the Court **DENIES** the motion.

## I.      BACKGROUND

This case arises out of the death of Edward Peterson ("Peterson"), who died while incarcerated at the Franklin County Correctional Center II ("FCCC").  Plaintiffs, the administrator of Peterson's estate and Peterson's son, brought a claim for Eight Amendment violations under 42 U.S.C. § 1983, as well as state-law claims for negligent provision of medical care, wrongful death, and loss of consortium.  Plaintiffs named fifty-four defendants to this action, all of whom worked in the FCCC section where Peterson was confined.  Defendant Edgington was the facility commander of FCCC at the time of Peterson's death.

The facts set forth below are taken from Plaintiffs' Amended Complaint and are assumed true for purposes of this analysis.  On August 5, 2011, Peterson was arrested for a misdemeanor and held in custody at FCCC.  At the time of his incarceration, Peterson suffered from

1

hypertensive cardiovascular disease, for which he received a daily regimen of medications. FCCC received a copy of Peterson's medical records and therefore was aware of Peterson's medical condition.

On August 8, 2011, Peterson was placed in an isolation cell. Peterson's cell was cleaned twice during the twenty-six days he was in isolation. Between cleanings, his cell was covered in trash and feces. Peterson's cell also lacked a mattress, although an internal affairs investigative report (which Plaintiffs incorporated into their Amended Complaint) indicates that Peterson was provided a mattress but destroyed it.

On September 4, 2011, at approximately 3:30 a.m., Peterson began to suffer breathing difficulties. A neighboring inmate asked Peterson if he was okay, to which Peterson replied, "no." Peterson was found unresponsive in his cell shortly after 9:00 a.m. and was pronounced dead at approximately 9:45 a.m.

Plaintiffs make several allegations regarding the quality of care Peterson received once he was found, but those allegations are irrelevant to this present motion. Plaintiffs do not suggest that Defendant Edgington was involved in that care.

Potentially relevant to this motion, however, is the allegation that two different deputies (Defendant Edgington's subordinates) assigned to make rounds on the isolation floor did not do a proper head count of the inmates on the day Peterson died. Presumably, drawing all inferences in Plaintiffs' favor, those deputies would have discovered Peterson's condition earlier had they properly performed their rounds. Plaintiffs also allege that the "Supervising officers" (which presumably include Defendant Edgington) "knew that their subordinates were not properly performing their duties and encouraged the falsification of reports to give the appearance of

compliance with the Rules, Regulations, and Procedures of the Franklin County Sheriff's Office." (Am. Compl. ¶ 96.)

Regarding Defendant Edgington specifically, Plaintiffs allege that he "knew of the inhumane conditions in Peterson's cell, knew that they posed a serious risk of harm to his health or safety, yet disregarded that risk by failing to take reasonable measures to abate it." (*Id.* ¶ 368.) Plaintiffs also allege that Defendant Edgington failed to adequately supervise subordinates who noticed deficiencies in the condition of Peterson's cell and deliberately failed to enter the common area of single cells to observe his subordinates' work during his rounds as supervisor, all the while "act[ing] with malicious purpose, in bad faith, or in a wanton or reckless manner in disregarding the known risk to Decedent." (*Id.* ¶ 371.)

As stated above, Plaintiffs incorporate into their Amended Complaint a report from an internal affairs investigation ("Report") conducted after Peterson's death. The Report appears to conflict with some of Plaintiffs' allegations. For example, according to the Report, Defendant Edgington stated that he never had any contact with Peterson, never observed him in his cell, was never advised by any supervisor/deputy under his command of the condition of Peterson's cell or that Peterson was missing a mattress, and was never aware that his supervisors were not entering the common area of single cells to observe inmates during their rounds. (ECF No. 119-1, at 36.)

The Report states that Defendant Edgington did not personally inspect any isolation cells during the time Peterson was incarcerated at FCCC. Defendant Edgington occasionally reviewed cell inspections completed by subordinates; he did not believe he was obligated to review them. Defendant Edgington stated that he did not remember seeing an inspection report dated August 31, 2011 that listed Peterson's cell as being in "fair" to "adequate" condition, with only two lights needing repair. (*Id.*) Defendant Edgington acknowledged that he ultimately is

responsible for the cleanliness of FCCC.  Finally, the Report concludes that Defendant

Edgington was neglectful for failing to supervise his direct subordinates, not personally spot

checking and/or inspecting isolation cells, and not reviewing and/or approving cell inspection

reports.  (*Id*. at 92.)

Defendant Edgington answered Plaintiff's Amended Complaint by denying many of the

allegations contained therein.  He subsequently filed a motion for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c), which the Court now considers.

## II.    ANALYSIS

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay

trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The Court

reviews motions made under Rule 12(c) in the same manner it would review a motion made

under Rule 12(b)(6).  *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006).

Accordingly, to survive a motion for judgment on the pleadings, a complaint must provide fair

notice of each claim and the grounds upon which it rests.  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555, 570 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A court, in ruling on a

Rule 12(b)(6) or Rule 12(c) motion, must construe the complaint in the light most favorable to

the plaintiff and treat all well-pleaded allegations contained therein as true.  *Id*. at 555–56.  The

defendant bears the burden of demonstrating that the plaintiff failed to state a claim for relief.

*Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).

Pursuant to Rule 8(a)(2), a complaint must contain a "short and plain statement of the

claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although Rule 8

does not require "detailed factual allegations," "it does not unlock the doors of discovery for a

plaintiff armed with nothing more than conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79

(2009).  A court need not "accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  Once the court has identified the well-pleaded allegations in the complaint, it should view each allegation in the context of the entire complaint to determine whether the plaintiff has alleged sufficient facts to support his or her claims.  *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011).

Considering only those well-pleaded facts, a complaint must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).  A plaintiff's factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim.  *Twombly*, 550 U.S. at 556.  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the court should dismiss the complaint.  *Iqbal*, 556 U.S. at 679.

  *1. Federal Claim – Eighth Amendment Violation Pursuant to 42 U.S.C. § 1983*

Pursuant to the United States Supreme Court's guidance in *Ashcroft v. Iqbal*, 556 U.S. 662, (2009), the Court begins its analysis by identifying the elements Plaintiffs must allege to state an Eighth Amendment claim under § 1983.

Section 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. There is no dispute that Defendant Edgington acted under color of state law at all times relevant. Accordingly, to state a § 1983 claim, Plaintiffs were required to allege that a constitutional violation occurred, a sufficient causal connection between Defendant Edgington and the violation, and that Defendant Edgington acted with a sufficiently culpable state of mind. *See, e.g., Lillard v. Shelby Cty Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996) (stating that the threshold inquiry for bringing a § 1983 claim is " 'whether the plaintiff has been deprived of a right secured by the Constitution and laws' " (citing *Banker v. McCollan*, 443 U.S. 137, 140 (1979))); *Lynn v. City of Detroit*, 98 F. App'x 381, 387 (6th Cir. 2004) (discussing causation); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (explaining the state of mind requirement).

Plaintiffs bring their claim under the Eighth Amendment to the United States Constitution, which prescribes cruel and unusual punishment. U.S. CONST. amend. VIII. In the prison context, the Eighth Amendment imposes certain duties on prison officials, including the duties to provide "humane conditions of confinement" and to "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832. An Eighth Amendment violation can be found only if the alleged deprivation is "sufficiently serious" and the prison official's act or omission resulted "in the denial of the minimal civilized measure of life's necessities." *Id*. at 834 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

Where, as here, a plaintiff challenges a prisoner's "conditions of confinement," the plaintiff must prove that the prison official acted with deliberate indifference to the inmate's health or safety. *Id*. That means that the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. Negligence cannot form the basis of a § 1983 claim. *See, e.g., Gregory*

*v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006) (citing *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).

The present dispute involves the issue of supervisory liability.  It is well settled that liability under § 1983 cannot be premised on a theory of respondeat superior.  *See, e.g., Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003).  In other words, supervisors cannot be held liable under § 1983 for the acts of their agents.

As such, when a plaintiff asserts a § 1983 claim against a supervisor premised on the acts or omissions of his or her subordinates, the plaintiff must allege and show an additional element: that the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it."  *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).  "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  *Id.* (citing *Hays v. Jefferson Cty.*, 668 F.2d 869, 872–74 (6th Cir. 1982)).[1]  The plaintiff must make this showing in addition to the three elements (violation, causation, and intent) set forth above.

It is important that note that supervisors are never immune from liability simply because of their status as supervisors.  If a supervisor violates an inmate's constitutional rights through the active performance of his or her duty, then liability is direct (not vicarious), and a § 1983 action may lie.  *See, e.g., Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) (finding that a supervisor could be liable for his conduct in approving inmate transfers without a reasonable policy in place to insure that the transferees were not placed in grave danger); *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992) (holding that a supervisor could be liable for, *inter alia*, referring inmate complaints to a nurse that he knew to be wrongly

---

[1] Defendant argues that the Supreme Court's decision in *Ashcroft v. Iqbal* "called into question the notion of personal involvement by knowing acquiescence."  (ECF No. 151, at 2.)  Because the Court does not rely on that theory of liability in its holding, however, it does not address this issue.

altering and destroying inmate prescriptions); *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) ("In both *Taylor* and *Hill*, it was the defendant supervisors' *active engagement* in a function of their position that directly resulted in injury to the plaintiffs." (emphasis added)); *see also Gregory*, 444 F.3d at 752.

Turning to the Amended Complaint in this case, the Court acknowledges that the allegations against Defendant Edgington are sparse. The Court also acknowledges that Plaintiffs' reliance on the Report's recommendation that Defendant Edgington be disciplined for "neglect or inattention to duty" is misplaced, as neglect or negligence cannot form the basis of a § 1983 claim. *See Gregory*, 444 F.3d at 751. Plaintiffs' argument that Defendant Edgington can be liable for "fail[ing] to perform his duties in monitoring his supervisors and deputies to ensure that rounds were being performed," (ECF No. 146, at 7), is similarly misplaced, as such "failure to supervise" allegations do not state a § 1983 claim. *See Gregory*, 444 F.3d at 751–52 (rejecting the notion that a supervisor's failure to review his or her subordinates' work can form the basis of a § 1983 claim against that supervisor in his or her individual capacity); *Essex*, 518 F. App'x at 355–56 (same). Nevertheless, for the reasons set forth below, the Court finds that Plaintiffs' Amended Complaint states a § 1983 claim against Defendant Edgington.

Plaintiffs allege that Peterson's cell was covered in trash and feces for much of the time Peterson was incarcerated. Because the Eighth Amendment imposes on prison officials the duty to provide "humane conditions of confinement" to inmates, *see Farmer*, 511 U.S. at 832, such an allegation could, if proved, establish an Eighth Amendment violation. *See, e.g., Taylor v. Larson*, 505 F. App'x 475, 478 (6th Cir. 2012) (holding that a prisoner-plaintiff stated a claim for an Eighth Amendment violation when he allegedly was confined for three days in a cell covered with feces). Plaintiffs therefore satisfied the first element of a § 1983 claim.

8

Plaintiffs also allege that Defendant knew about the conditions in Peterson's cell, knew that they posed a serious risk of harm to Peterson's health and safety, yet failed to take reasonable measures to fix those conditions, despite being responsible for the cleanliness of FCCC.  Necessarily viewing those allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds those allegations sufficient to allege causation and intent. Although several explanations might exist for the conditions in Peterson's cell and for why Defendant did not rectify those conditions, the Court cannot speculate about those reasons at the pleadings stage of this litigation.  The Court also cannot discount Plaintiffs' allegation that Defendant Edgington knew of the conditions in Peterson's cell, despite the seemingly conflicting statements in the Report that he was not aware of those conditions.  That discrepancy presents a factual issue that is more appropriately resolved after discovery is complete.

Defendant Edgington argues that Plaintiffs failed to properly allege intent, stating: "Plaintiffs have alleged no specific facts indicating how Mr. Edgington was aware of the conditions of Decedent's confinement or how Mr. Edgington was aware that such conditions posed a risk to Decedent's health."  (ECF No. 137, at 4–5.)  But Rule 8—even post-*Twombly/Iqbal*—does not require a plaintiff to allege facts explaining "how" a defendant acquired certain knowledge.  Indeed, even under the heightened pleading requirements of Rule 9(b) (which do not apply to this case), "[m]alice, intent, knowledge, and other conditions of a person's mind" may still "be alleged generally."  Fed. R. Civ. P. 9(b).

Defendant next argues that "a supervisor's knowledge of misdeeds by his agents or an alleged failure to act cannot form the basis for § 1983 liability."  (ECF No. 137, at 5.)  But that argument assumes that Defendant delegated responsibility for cleaning Peterson's cell to a subordinate or was not otherwise responsible for cleaning it himself.  That may be true; however,

9

Defendant offers no authority that would permit the Court to assume that fact at the Rule 12(c) stage of this litigation.  Instead, the Court must rely on Plaintiffs' allegations that Defendant was responsible for the cleanliness of FCCC, knew that Peterson's cell was covered in trash and feces, and acted in bad faith by failing to take any action to rectify that condition.  Those allegations state a claim for direct liability against Defendant; the *Bellamy* factors for supervisory liability do not come into play.

Even assuming, however, that Plaintiffs are attempting to invoke supervisory liability, both parties agree that such liability can be imposed where the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it."  *Bellamy v. Bradley*, 729 F.2d at 421.  Plaintiffs alleged that the "Supervising officers" (which, as stated above, presumably include Defendant Edgington) "encouraged the falsification of reports to give the appearance of compliance with Rules, Regulations, and Procedures of the Franklin County Sheriff's Office."  (Am. Compl. ¶ 96.)  The Court acknowledges that this allegation is light on facts; however, combined with Plaintiffs' other allegations that a cell inspection report did not accurately reflect the condition of Peterson's cell, the Court finds it sufficient to survive Defendant's Rule 12(c) motion.  *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d at 782 (stating that a court should view each allegation in the context of the entire complaint to determine whether the plaintiff has alleged sufficient facts to support his or her claims).  Defendant does not address this allegation in his motion.

For those reasons, the Court finds that Plaintiffs' § 1983 allegations state a claim against Defendant Edgington.  The Court therefore **DENIES** Defendant Edgington's motion with respect to Count One.

2.  *State Law Claims*

Defendant Edgington offers two arguments as to why Plaintiffs' state law claims should be dismissed.  First, Defendant Edgington argues that he is immune from liability for Plaintiffs' state law claims pursuant to Ohio Revised Code § 2744.03(a)(6).  Second, Defendant Edgington argues that Plaintiffs failed to set forth the elements of a wrongful death claim under Ohio law.  As explained below, these arguments are without merit.

Regarding immunity, § 2744.03(a)(6) provides that an employee of a political subdivision is immune from liability unless, *inter alia*, his or his acts or omissions were made with malicious purpose, in bad faith, or in a wanton or reckless manner.  For the same reasons that Plaintiffs' allegations are sufficient to infer deliberate indifference, they are sufficient to infer malicious purpose, bad faith, or wanton/reckless behavior.  Defendant Edgington does not offer any persuasive arguments to the contrary.[2]

Regarding the wrongful death claim, Ohio law requires that a party asserting such a claim allege and prove three elements: a duty owed to the decedent, a breach of that duty, and proximate causation between the breach of duty and the death.  *See, e.g., Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St. 3d 86, 454, 529 N.E.2d 449 (1988).  Plaintiffs allege that "FCCC personnel" (which presumably includes Defendant Edgington) received a copy of Peterson's medical records and therefore were aware of his medical issues.  (Am. Compl. ¶ 65.) Plaintiffs similarly allege that, as facilities commander, Defendant Edgington was responsible for his subordinates' cell inspections and rounds of the isolation unit.  And, taking Plaintiffs'

---

[2] Defendant Edgington's argument relies on several passages from the Report reflecting his statements that he did not know Peterson's cell was dirty and had no reason to know that his subordinates were not properly inspecting cells.  As stated above, however, Plaintiffs allege that Defendant Edgington knew of the conditions in Peterson's cell yet failed to rectify them.  (Am. Compl. ¶ 368.)  The Court is obligated, at this stage of the litigation, to accept Plaintiffs' allegations as true and draw all reasonable inferences in their favor.  To the extent there exists a discrepancy between Plaintiffs' allegations and Defendant Edgington's statements in the Report, the Court is obligated to draw the inference that Plaintiffs' allegation is factually correct and Defendant Edgington's statements in the Report are incorrect.

allegations as true, the Court must assume that Defendant Edgington's subordinates did not properly perform their rounds on the night Peterson died and therefore did not find Peterson unresponsive for several hours after they otherwise would have. Necessarily accepting these allegations and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs' wrongful death allegations are sufficient to survive Defendant Edgington's Rule 12(c) motion. The Court therefore **DENIES** Defendant Edgington's motion with respect to Plaintiffs' state law claims.

### III.     CONCLUSION

For the foregoing reasons, the Court finds that Defendant Edgington failed to meet his burden in demonstrating that judgment on the pleadings is proper. Accordingly, the Court **DENIES** Defendant Edgington's motion for judgment on the pleadings. (ECF No. 137.)

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost**
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**