**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1            IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF OHIO

3                  EASTERN DIVISION

4                     - - -

5    John C. Ruiz-Bueno,        )

6    III, et al.,               )  Case No. 2:12-cv-00809

7            Plaintiffs,        )  Judge Frost

8       vs.                     )  Magistrate Judge Kemp

9    Franklin County Sheriff    )

10   Zach Scott, et al,         )

11           Defendants.        )

12                    - - -

13          Deposition of Damien Neely, a Defendant

14   herein, called by the Plaintiffs for

15   cross-examination under the applicable rules of

16   Federal Civil Court Procedure, taken before me,

17   Amy L. Miller, Registered Professional Reporter

18   and Notary Public in and for the State of Ohio,

19   pursuant to notice and stipulations of counsel

20   hereinafter set forth, at the offices of the

21   Franklin County Prosecuting Attorney's Office,

22   373 South High Street, 13th Floor, on Monday,

23   July 15, 2013, beginning at 1:05 o'clock p.m. and

24   concluding on the same day.

25                    - - -

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFFS:

 4         Avonte D. Campinha-Bacote, Esq.

 5         Campinha Bacote, LLP

 6         One Market Street, Steuart Tower, Suite 500

 7         San Francisco, California  94105

 8         (415) 426-7111     Fax: (415) 276-2988

 9         avonte@cambaclaw.com

10

11    ON BEHALF OF THE DEFENDANT MAJOR EDGINGTON:

12         Andrew N. Yosowitz, Esq.

13         Isaac Wiles

14         Two Miranove Place, Suite 700

15         Columbus, Ohio  43215

16         (614) 221-2121     Fax:  (614) 365-9516

17         ayosowitz@isaacwiles.com

18

19

20

21

22

23

24

25
```

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

```
 1   APPEARANCES: (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS FRANKLIN COUNTY

 4   SHERIFF ZACK SCOTT:

 5       Ron O'Brien

 6       Franklin County Prosecuting Attorney

 7       By:  Scott O. Sheets, Esq.

 8            Assistant Prosecuting Attorney

 9            Civil Division

10            373 South High Street, 13th Floor

11            Columbus, Ohio  43215

12            (614) 525-6399    Fax:  (614) 525-6012

13            SSheets@franklincountyohio.gov

14       and

15       Ron O'Brien, Esq.

16       Franklin County Prosecuting Ohio

17       By:  Mary Jane Martin, Esq.

18            Assistant Prosecuting Attorney

19            Civil Division - Litigation Unit

20            373 South High Street, 13th Floor

21            Columbus, Ohio  43215

22            (614) 525-3520    Fax: (614) 525-6012

23

24                      - - -

25
```

```
 1              S T I P U L A T I O N S

 2                      - - -

 3          It is stipulated by and among counsel

 4   for the respective parties that the deposition of

 5   Damien Neely, a Defendant herein, called by the

 6   Plaintiffs for cross-examination under the

 7   applicable rules of Federal Civil Court

 8   Procedure, may be taken at this time by the

 9   Notary pursuant to notice; that said deposition

10   may be reduced to writing in stenotype by the

11   Notary, whose notes may thereafter be transcribed

12   out of the presence of the witness; that proof of

13   the official character and qualification of the

14   Notary is waived; that the witness may sign the

15   transcript of his deposition before a Notary

16   other than the Notary taking his deposition; said

17   deposition to have the same force and effect as

18   though the witness had signed the transcript of

19   his deposition before the Notary taking it.

20                      - - -

21

22

23

24

25
```

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

```
 1                    I N D E X

 2                       - - -

 3    WITNESS                                  PAGE

 4    Damien Neely

 5       Cross-examination by Mr. Campinha-Bacote    6

 6                       - - -

 7    EXHIBITS                              MARKED

 8    Exhibit No. 11 -                      14

 9       Defendant Damien Neely's Responses to

10       Plaintiffs' First Set of

11       Interrogatories and Production

12    Exhibit No. 12 -                      44

13       Photographs

14                       - - -

15

16

17

18

19

20

21

22

23

24

25
```

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1                      DAMIEN G. NEELY

2    of lawful age, being by me first duly placed

3    under oath, as prescribed by law, was examined

4    and testified as follows:

5                      CROSS-EXAMINATION

6    BY MR. CAMPINHA-BACOTE:

7         Q.    Mr. Neely, if you would please state

8    your name for the record.

9         A.    My name is Damien Germaine Neely.

10        Q.    Can you spell that, please?

11        A.    D-a-m-i-e-n, G-e-r-m-a-i-n-e, N-e-e-l-y.

12        Q.    Thank you very much.  And have you ever

13   had your deposition taken before?

14        A.    I have not.

15        Q.    Okay.  Before we start, I want to go

16   over a few ground rules, just so you know how

17   this process is going to work here today.  The

18   first is that you do notice we have a court

19   reporter present here today, so what I would ask

20   is that you try not to speak too fast because

21   sometimes it can be difficult for the court

22   reporter to transcribe what we're saying if we're

23   talking too fast.

24             In addition, I would ask that we not

25   speak over one another.  Again, with the court

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1    reporter here, it's going to make it very

2    difficult for her to try to capture what we're

3    both saying if we're talking over each other, so

4    I'll be respectful and let you fully answer my

5    questions, if you, in turn, let me finish asking

6    my question before you answer.

7           Oftentimes, people will have nonverbal

8    gestures such as head nods or "uh-huhs", and I

9    would ask again, because we have a court reporter

10   here today, that you make sure you articulate and

11   verbalize all of your responses here today.

12          If I ask you a question, I'm going to

13   assume that you understand the question, so if

14   you don't understand anything I'm saying, just

15   let me know.  I'll be happy to rephrase it so

16   that you do understand everything that I'm

17   saying.

18          And lastly and maybe most importantly,

19   if at any point in time here today you feel like

20   you need to take a break, I'm completely fine

21   with that.  This isn't a marathon.  The only

22   question -- or the only condition I would have is

23   that if I have a pending question to you that you

24   finish the question that's been asked to you

25   before you take a break.  I assume at some point

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    in time you'll need to go to the bathroom or

2    might just want to take a break in general, so

3    just let me know or let your attorney know, and

4    we'll make sure to do that.

5            Does all that sound okay to you?

6        A.   It does.

7        Q.   Great.  Is there any reason why you

8    believe you can't testify truthfully here today?

9        A.   No, there is not.

10       Q.   Okay.  And are you presently under the

11   influence of any medications, be it prescription

12   or nonprescription?

13       A.   Yes, I take metformin.

14       Q.   Okay.  Do you feel like that would

15   impact your ability to testify here today?

16           MR. SHEETS:  I'm going to object because

17   that's medically privileged information.  I mean,

18   you can answer about whether it would -- you

19   understand what my objection is?

20           I have no problem with him asking you

21   whether you can testify truthfully, but I don't

22   want you talking about things that are between

23   you and your doctor.

24   BY MR. CAMPINHA-BACOTE:

25       Q.   Do you feel that -- I'll ask you the

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1    question again.  Do you feel that the fact that

2    you are on medication would prevent you from

3    testifying here today truthfully?

4         A.   No.

5         Q.   Okay.  Did you prepare for this

6    deposition?

7         A.   No.

8         Q.   Did you meet with your attorneys before

9    being deposed here today?

10        A.   Yes.

11        Q.   When did you meet with them?  And before

12   you answer, just so we're clear, I'm not

13   interested in knowing what you said between your

14   attorney, because that is certainly privileged,

15   I'm not entitled to that, but with respect to

16   when you met, that's what I'm interested in with

17   that question, if you can recall.  If you don't

18   recall, that's fine.

19        A.   It was Thursday.

20        Q.   Of last week?

21        A.   Of last week.

22        Q.   Okay.  Was that the first time you met

23   with your attorneys?

24        A.   No.

25        Q.   Okay.  When else did you meet with your

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    attorneys?

2        A.    I don't remember.

3        Q.    Do you recall how many times, if it was

4    one prior time --

5            MR. SHEETS:  I'm going to go ahead and

6    object based on attorney/client privilege.  I

7    think we're just getting close to the area.

8            MR. CAMPINHA-BACOTE:  Okay.  I'm just --

9            MR. SHEETS:  If you can recall how many

10   times you met with me or Mary Jane, you can

11   answer.

12           THE WITNESS:  I cannot recall how many

13   times.

14   BY MR. CAMPINHA-BACOTE:

15       Q.    Would it be more than five?

16       A.    No.

17       Q.    More than two?

18           MR. SHEETS:  I think he said he can't

19   remember, so if we can move on, that would be

20   great.

21   BY MR. CAMPINHA-BACOTE:

22       Q.    Right.  If you can just verbalize a

23   response.

24       A.    I don't remember.

25       Q.    Okay.  And, lastly, do you recall

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1  roughly when that happened, whether it was in the

2  past couple of months, was it in the past six

3  months, year?  Again, if you don't recall, that's

4  fine.

5       A.   Other than Thursday, no, I do not

6  recall.

7       Q.   Okay.  And who was all present when you

8  met with your attorneys?

9       A.   I do not recall.

10      Q.   Was Mr. Sheets present?

11           MR. SHEETS:  Objection.  I don't want

12  him answering about any meeting with me.  I'm

13  sorry.

14           MR. CAMPINHA-BACOTE:  Well, I have the

15  right to know who was present, I'm not asking for

16  communications.

17           MR. SHEETS:  He just said he can't

18  recall.

19           MR. CAMPINHA-BACOTE:  Let me conduct my

20  deposition.  He has not answered the question

21  yet.  We can go back to the court reporter.

22           MR. SHEETS:  I think he said he doesn't

23  know.

24           MR. CAMPINHA-BACOTE:  My last question

25  was -- let's go back to the reporter, starting

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1   with my last question was, "Was Mr. Sheets

2   present," if you can tell me if the witness

3   responded to that question.

4          MR. SHEETS:  How about I just stipulate

5   I was present and then we can move on.

6          MR. CAMPINHA-BACOTE:  Okay.

7   BY MR. CAMPINHA-BACOTE:

8      Q.   So Mr. Sheets was present?

9          MR. SHEETS:  Yes, I met with my clients.

10  BY MR. CAMPINHA-BACOTE:

11     Q.   Was Miss Mary Jane Martin present to the

12  best of your recollection?

13     A.   I don't remember who was all there.

14     Q.   Okay.  And do you remember how many

15  people were there?

16     A.   No, I do not.

17     Q.   Okay.  Can you recall how long you met

18  for?

19     A.   No, I do not.

20     Q.   Okay.  Did you review any documents

21  during any of those meetings?

22          MR. SHEETS:  Objection.  To the extent

23  it's anything that we showed you or discussed, do

24  not answer those questions.

25  BY MR. CAMPINHA-BACOTE:

MCGINNIS & ASSOCIATES, INC.
614.431.1344 COLUMBUS, OHIO 800.498.2451

1    Q.   I'm not asking what documents you

2  reviewed.  I'm asking if you reviewed documents.

3    A.   I'll defer to my attorney on that one.

4    Q.   Okay.  Well, you --

5         MR. CAMPINHA-BACOTE:  Scott, if you can

6  instruct him to answer that question.

7         MR. SHEETS:  I'm not going to do that,

8  Avonte.  I feel like these are really just

9  probing into areas that I'm not comfortable with.

10  I have attorney/client privilege with him.

11         MR. CAMPINHA-BACOTE:  Let's go off the

12  record.

13         (Discussion held off the record.)

14         MR. CAMPINHA-BACOTE:  If you would read

15  the witness back the last question.

16         (Question read back as requested.)

17         THE WITNESS:  Yes.

18  BY MR. CAMPINHA-BACOTE:

19    Q.   Thank you.

20         And, again, I'm not asking for the

21  contents of information, but did you produce any

22  documents to your attorneys when you met with

23  them?

24    A.   No.

25    Q.   Okay.  Thank you.

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1        MR. CAMPINHA-BACOTE:  I'm going to have

2   this marked as whatever the next exhibit is.

3                    - - -

4        Thereupon, Exhibit No. 11 was marked for

5            purposes of identification.

6                    - - -

7   BY MR. CAMPINHA-BACOTE:

8        Q.   Mr. Neely, you have a copy right there.

9        MR. SHEETS:  I get to look at what

10  he's --

11       MR. CAMPINHA-BACOTE:  Absolutely.  Let

12  me know when you're done reviewing it, Scott.

13       MR. SHEETS:  All right, thanks.

14  BY MR. CAMPINHA-BACOTE:

15       Q.   Mr. Neely, I'm handing you what's been

16  marked for identification purposes as Exhibit 11.

17       Could you please take a look at that

18  document and let me know when you're finished

19  reviewing it?

20       A.   I'm finished reviewing it.

21       Q.   Just hold on for a second, sir.  Have

22  you ever seen that document before?

23       A.   I have.

24       Q.   Okay.  And if you turn to the second to

25  last page, you'll see that it's a verification

1    page, I believe it's Page 16.

2            And is that your signature under -- or

3    above Damien Neely?

4        A.   That is my signature.

5        Q.   And you signed that in front of a public

6    notary?

7        A.   I did.

8        Q.   Okay.  And as you can read where it

9    says, "Damien Neely, being first duly sworn,"

10   this documents certifies that you've read each

11   response and you swear to the contents and the

12   accuracy of that, correct?

13       A.   That is correct.

14       Q.   If you turn to the first page, it

15   says -- Interrogatory Number 1 at the bottom.  It

16   says, "State the names and addresses of all

17   persons that assisted with answering these

18   interrogatories," and then if you turn to Page 2,

19   it states your name.

20           Do you see that?

21       A.   I see that.

22       Q.   So am I to assume that you were the one

23   who drafted these documents or was there anyone

24   else that helped assist this?

25       A.   I did not draft these documents.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    Q.  So you would agree that this is an

2  incorrect statement insofar as there were other

3  people that assisted you with answering these

4  interrogatories and preparing these?

5            MR. YOSOWITZ:  Objection.

6            MR. SHEETS:  Objection, no foundation.

7  I'm not sure what the point of the question is,

8  but I think it goes without saying that attorneys

9  help their clients prepare interrogatory

10  responses.

11            MR. CAMPINHA-BACOTE:  I understand that,

12  and there are no speaking objections in

13  depositions, just so we're clear about that.

14            MR. SHEETS:  That's not what your

15  partner said on Friday, but I guess you guys

16  finally got that one right, but whatever, however

17  you want to handle it.

18            MR. CAMPINHA-BACOTE:  If you could read

19  that question back again, if you have it.

20            (Question read back as requested.)

21            MR. SHEETS:  Yes or no.

22            THE WITNESS:  I will say yes, it was.

23  BY MR. CAMPINHA-BACOTE:

24    Q.  Thank you very much.  All right.  Let's

25  talk about some of your background.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

```
 1              Could you please state your work address
 2      for the record?
 3           A.   2460 Jackson Pike, Columbus, Ohio 43223.
 4              MR. CAMPINHA-BACOTE:  Let's go off the
 5      record real quick.
 6              (Discussion held off the record.)
 7      BY MR. CAMPINHA-BACOTE:
 8           Q.   Are you married?
 9           A.   I am married.
10           Q.   And what is your wife's name?
11           A.   Benita Neely.
12           Q.   How do you spell Benita?
13           A.   B-e-n-i-t-a.
14           Q.   Thank you.  Do you have any kids?
15           A.   No, I do not.
16           Q.   Okay.  What high school did you go to?
17           A.   Walnut Hills High School.
18           Q.   Cincinnati, Ohio?
19           A.   Cincinnati, Ohio.
20           Q.   Okay.  After high school did you go to
21      college?
22           A.   I went to Ohio State University.
23           Q.   Okay.  Did you graduate?
24           A.   I did not.
25           Q.   What year did you begin college at Ohio
```

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    State?

2        A.   In 1994.

3        Q.   Did you go to any other type of

4    educational institutions after high school apart

5    from Ohio State?

6        A.   I don't remember.  I don't recall.

7        Q.   Did you go to graduate school, for

8    example?

9        A.   No, I did not.

10       Q.   Do you hold any certifications or

11   licenses?

12       A.   Other than a correctionalist, no.

13       Q.   Okay, other than correctional.

14            And I'm assuming that you received

15   training as a corrections officer, as a deputy?

16       A.   That's correct.

17       Q.   And when did you receive that training,

18   if you can recall?

19       A.   I would say 1998.

20       Q.   Okay.  How long did that training last?

21       A.   It was -- I don't remember.

22       Q.   Okay.  Did you hold any certifications

23   such as like CPR or anything like that?

24       A.   Yes, we did.

25       Q.   So are you presently certified in

MCGINNIS & ASSOCIATES, INC.
614.431.1344 COLUMBUS, OHIO 800.498.2451

1    administering CPR?

2        A.    I am.

3        Q.    And you're current and up to date?

4        A.    I am.

5        Q.    Okay.  Let's start with after college,

6    what was your first job?  And I'll limit that

7    to -- I'm not looking for if you worked as a

8    pizza boy or something like that.  Your first

9    professional employment.

10       A.    After college -- I actually worked

11   during college.

12       Q.    Okay.

13       A.    And that was with -- then it was RPS,

14   Roadway Packing Systems before Fed-Ex bought

15   them.

16       Q.    You said RPS?

17       A.    Yes.

18       Q.    Okay.

19       A.    From RPS, I also worked at Papa John's.

20       Q.    Okay.  And when you worked at RPS, was

21   that here in Columbus?

22       A.    Just south of Columbus in Grove City.

23       Q.    Okay.  And what was your position there?

24       A.    Loading boxes on a truck.

25       Q.    Okay.  Do you recall roughly what year

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    that was?

2        A.    I do not.

3        Q.    Okay.  What was your next job after

4    that?

5        A.    Papa John's, I became a manager at Papa

6    John's, so I quit working at RPS.

7        Q.    How about after Papa John's?

8        A.    Franklin County Sheriff's Office.

9        Q.    And what year did you begin with the

10   Franklin County Sheriff's Office?

11       A.    1998.

12       Q.    And what was your position with the FCSO

13   when you began in 1998?

14       A.    Deputy sheriff.

15       Q.    Since then have you received any

16   promotions or any type of things of that nature?

17       A.    I have not.

18       Q.    Okay.

19            MR. SHEETS:  Do you want to know -- can

20   I interrupt you one second?  We can take care of

21   the home address thing if you would like.

22            MR. CAMPINHA-BACOTE:  Sure.  Do you want

23   to go off the record for that?

24            MR. SHEETS:  Yes.

25            MR. CAMPINHA-BACOTE:  Let's go off the

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    record, please.

2              (Discussion held off the record.)

3    BY MR. CAMPINHA-BACOTE:

4        Q.    Deputy Neely, we went off the record a

5    moment ago, and you gave me your home address.  I

6    just want to verify that that was your true and

7    accurate home address; is that correct?

8        A.    That's correct.

9        Q.    Thank you.  Now, let's go back.  I

10   believe the last thing we talked about was your

11   employment with the FCSO, and you became a deputy

12   in 1998.

13             I think you spoke to this briefly, but

14   you said in terms of training that you received

15   to become a deputy, was there any other training

16   that you received other than what you mentioned

17   to me previously?

18       A.    Not that I recall, no.

19       Q.    And what was the official name of this

20   training, if you know?

21       A.    Corrections classes.

22       Q.    Corrections classes?

23       A.    Yes.

24       Q.    I'll keep referring to it as that then.

25   In these corrections classes did you have any

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1    type of courtroom -- excuse me -- any classroom

2    instruction?

3        A.    Yes.

4        Q.    Okay.  If you can just explain to me in

5    your own words kind of how that corrections

6    classes happened, whether there was anything

7    apart from classroom instruction or if there was

8    any type of, you know, training that was out in

9    the field, for example.  Just walk me through

10   since I don't really know too much about that,

11   how that operates and works.

12       A.    All the corrections classes training

13   occurred in the classroom.  We have instructors

14   come in and pretty much was lecture-based

15   teaching.

16       Q.    Okay.  Can you recall any of the types

17   of the classes or even topics that you learned in

18   corrections classes?

19       A.    Interpersonal communication skills.

20   Wow, that was a very long time ago.

21       Q.    I know this was 15 years ago.  I'm

22   testing your memory.  If you can't recall, that's

23   fine, but just to the best of your memory.

24       A.    CPR.

25       Q.    That's okay.  Let me ask some specific

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    questions.  Did you receive any instruction or

2    take any classes on safety?

3        A.    Safety in what manner?

4        Q.    Safety of the inmates?

5        A.    Not that I remember, no.

6        Q.    What about responding to emergencies?

7        A.    Yes.

8        Q.    What about cleaning cells?

9        A.    No.

10       Q.    Okay.  What about how to identify or

11   deal with an inmate who has mental health issues?

12       A.    No.

13       Q.    And just so I know, sitting here today,

14   what is the protocol if you discover an inmate

15   who in your opinion has a mental condition or a

16   mental health issue?

17           MR. SHEETS:  Objection, but you can

18   answer the question.  It's all right.

19           THE WITNESS:  Has the person already

20   been diagnosed with a mental health condition?

21   BY MR. CAMPINHA-BACOTE:

22       Q.    Let's say no.

23       A.    They have not?  Then if I believe that

24   they have a mental health issue, I will refer

25   them to the mental health specialist.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    Q.   And do you know who that person is?

2    A.   That is Doug Hahn.

3    Q.   Now, what if they were known to be

4  diagnosed with some type of a mental health

5  condition, is there any type of protocol or

6  special way you would treat them?

7    A.   That would be up to Doug Hahn.

8    Q.   Have you ever been instructed by Doug

9  Hahn to treat someone differently because of

10  their mental condition?

11    A.   I have not.

12    Q.   Are you aware of him informing anyone to

13  treat any inmate differently because of a mental

14  health condition?

15    A.   No.

16    Q.   Okay.  Now, take me through a routine

17  day, if you can, and I'm interested in knowing

18  what your job responsibility was as deputy.

19    A.   My job responsibilities are to maintain

20  the security of the facility, the staff, and the

21  inmates, and to perform miscellaneous duties as

22  prescribed by the shift supervisor.

23    Q.   So would you conduct rounds, for

24  example?

25    A.   What rounds do you mean, security

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    watches?

2        Q.   Correct.

3        A.   Correct.

4        Q.   What about head counts?

5        A.   We are responsible for three head counts

6    during the day.

7        Q.   And were you responsible for three head

8    counts during the time frame of August 2011 and

9    September 2011?

10       A.   Any time we work, we're responsible for

11   three head counts.

12       Q.   Were you responsible for doing med pass?

13       A.   Well, the deputy assigned to the floor

14   does med pass, yes.

15       Q.   So in your experience, you've performed

16   those duties several times?

17       A.   I have.

18       Q.   You've been assigned to that?

19       A.   I have, yes.

20       Q.   Explain to me how that works.  I assume

21   you're not the one who actually hands out the

22   medication, but you assist some type of medical

23   employee that does that?

24       A.   I provide security for the nurse as she

25   passes meds.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      Q.   Is there just one nurse or is there

2   several nurses that you work with?

3      A.   Each floor is assigned one nurse.

4      Q.   Apart from this lawsuit, meaning the

5   circumstances surrounding Edward Peterson's

6   death, have you ever been disciplined since

7   you've been there in 1998 for any reason?

8      A.   Yes.

9      Q.   And if you can recall which -- what you

10   were disciplined for and when.

11      A.   When, I really couldn't tell you.  Let's

12   see.

13      Q.   If it helps to go backwards in terms of

14   when was the last time you were disciplined

15   starting from today?

16      A.   The last time I was disciplined, entered

17   a cell to assist another deputy who I thought was

18   in an altercation with an inmate.  That was -- I

19   don't know when it was.

20      Q.   And why were you disciplined for that?

21      A.   Because according to procedure, we

22   should have called the code blue first.

23      Q.   Okay.  And did that happen after the

24   events surrounding Mr. Peterson's death or

25   before?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      A.    That would be after.

2      Q.    Okay, after.  Anything else happen after

3   the death of Mr. Edward Peterson, which was, for

4   the record, September 4th, 2011?

5      A.    Other than that incident, no.

6      Q.    Okay.  Now, take me back before

7   Mr. Peterson's death, if you can recall how many

8   times you've been disciplined.

9      A.    I don't remember.

10     Q.    Is it safe to say that you have been

11  disciplined before September 4th, 2011, or are

12  you stating that you have not been disciplined?

13     A.    I have been disciplined before.

14     Q.    Okay.  And I understand you can't recall

15  exactly when that happened, but do you recall the

16  nature of that discipline, what it was for?

17     A.    I do not.

18     Q.    Okay.  Now, I assume that the instances

19  you just referred me to were where you were

20  formally disciplined.  Now, what about informal

21  reprimand, something that wouldn't result in a

22  write-up, for example?

23     A.    No, not that I recall.

24     Q.    Okay.  Now, regarding the events that

25  involved the death of Mr. Edward Peterson, I

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    understand that you spoke with Sergeant D'Errico

2    about this matter, correct?

3         A.   That is correct.

4         Q.   Is there any other deputies that you

5    spoke about -- that you spoke with about this

6    matter during the course of the investigation?

7         A.   Other than the two detectives from

8    internal affairs, no.

9         Q.   Okay.  And those detectives were?

10        A.   Detective D'Errico and I believe it was

11   Lieutenant Eing, E-i-n-g.

12        Q.   Thank you.  I think we were trying to

13   figure out how to spell that for the longest

14   time.

15             Did you ever speak to Sheriff Scott

16   about this?

17        A.   I have not.

18        Q.   Okay.  Now, outside of Franklin County

19   personnel, have you discussed this case with

20   anyone?

21        A.   My wife.

22        Q.   Okay.  And what did you speak with her

23   about or what did you -- what was that

24   communication?

25        A.   I told her that I was being sued for --

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    in regards to Mr. Peterson.

2         Q.   Okay.  Anything else?

3         A.   That was it.

4         Q.   Okay.  Is there anyone else, whether it

5    was family, friends, or anyone else that you

6    spoke with about this case?

7         A.   No.

8         Q.   What about deputies, any other deputies

9    that you spoke to about this case outside the

10   investigation?

11        A.   No.

12        Q.   If you don't know the answer to the

13   question, that's fine, just let me know, but are

14   you aware of anyone in terms of deputies being

15   disciplined as a result of the events surrounding

16   the death of Mr. Edward Peterson sitting here

17   today?

18        A.   Not, not that I know of.

19        Q.   If you can recall, during the months of

20   August 5th, 2011, and September 4, 2011, you

21   remember -- excuse me -- you remember an inmate

22   by the name of Edward Peterson, correct?

23        A.   I do.

24        Q.   And it looks like from your schedule

25   that you had several interactions with

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1    Mr. Peterson, correct?

2         A.    By "interactions," what do you mean?

3         Q.    Whether it was viewing him in his cell

4    or having some type of exchange with him in terms

5    of speaking to him.

6         A.    Yeah.

7         Q.    I want to refer you to -- I believe it's

8    Exhibit 2.

9              MR. CAMPINHA-BACOTE:  You should already

10   have a copy of this, Guys.  This is a copy of the

11   report by Sergeant D'Errico.

12   BY MR. CAMPINHA-BACOTE:

13        Q.    You can hand me that exhibit back, if

14   you would like, this one right here.  We're done

15   with that.  Thank you.

16             All right.  Handing you what's been

17   marked for identification purposes as Exhibit 2.

18   Will you briefly take a look at this.  You don't

19   have to read every page, it's quite lengthy, but

20   let me know if you've seen this document before

21   or some of the contents of this document.  You

22   can keep that in front of you.

23             Do you recognize that document?

24        A.    No, I've not seen this document before.

25        Q.    Okay.  Well, if you can turn to Page 7

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    of that document, please.  Page 7 appears to be a

2    spreadsheet of when certain deputies were

3    assigned to the isolation post during the course

4    of Edward Peterson's stay at Franklin County,

5    which was again August 5th, 2011 to

6    September 4th, 2011.  Do you see that, what I'm

7    referring to on that page?

8         A.   The spreadsheet at the bottom half?

9         Q.   Correct.

10        A.   That is correct, I see that.

11        Q.   You'll notice that it goes on to Page 8

12   if you flip the page.

13        A.   Yes, I see that continues to Page 8.

14        Q.   Do you see your name written under third

15   shift numerous times?

16        A.   I do.

17        Q.   You can briefly take a look, but are

18   those accurate records of when you were assigned

19   to third shift in the isolation post during that

20   time frame?

21        A.   I am not entirely sure, but it looks

22   right.

23        Q.   I believe you -- you remember sitting

24   down for an interview with Sergeant D'Errico,

25   correct?

```
 1        A.    Correct.

 2        Q.    And I believe he also showed you your

 3   schedule; is that true, if you can recall?

 4        A.    I do not recall.

 5        Q.    Okay.  But would you stipulate here

 6   today that if this schedule at the time he showed

 7   it to you, you acknowledged that it was correct

 8   to the best of your knowledge, that it would be

 9   the same here today?

10             MR. SHEETS:  Objection.  Answer if you

11   can.

12   BY MR. CAMPINHA-BACOTE:

13        Q.    If you need to me to rephrase it, I

14   can --

15        A.    Yes, please.

16        Q.    In other words, has anything -- I'll

17   represent to you this is the same document that

18   Sergeant D'Errico showed you on January 26th of

19   2012.

20             Is there any reason for you to doubt

21   that anything has changed with respect to your

22   schedule as it reflects here in this document?

23             MR. SHEETS:  Objection.  You can answer.

24             THE WITNESS:  If this is the same

25   thing -- you said this is the same that D'Errico
```

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    gave you.  I would probably say yes.

2    BY MR. CAMPINHA-BACOTE:

3        Q.   Okay.  I'm just making sure nothing has

4    changed since then that you now want to say that

5    actually, I've thought about it for a little bit

6    and this is actually incorrect.  But as far as

7    you recall, this is accurate to the best of your

8    representation?

9        A.   I believe so, yes.

10       Q.   Thank you.

11            So according to this schedule, it seems

12   like you've had about 16 instances where you

13   performed some type of round or head count where

14   you either viewed Mr. Peterson or were in his

15   area, the common area.

16            Do you recall anything specifically

17   about Mr. Peterson in terms of his demeanor or

18   personality?

19       A.   I remember he would always ask if it was

20   time to eat.

21       Q.   Were you aware that he had a mental

22   condition?

23       A.   I was not aware, but I had an idea.

24       Q.   What do you mean by that, just so I

25   understand what you mean?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      A.    Isolation is normally where we put the

2   people with behavior issues and mental health

3   issues.

4      Q.    So it was safe to assume that if

5   Mr. Peterson was in isolation, he probably had

6   one of those two issues?

7      A.    Yes.

8      Q.    And is it your testimony that from

9   dealing with Mr. Peterson it was your position

10  that he had more of a mental health issue rather

11  than a behavior issue or --

12         MR. SHEETS:  Objection.  You can answer.

13  BY MR. CAMPINHA-BACOTE:

14     Q.    Or feel free to clarify.

15     A.    It was more a matter of process of

16  elimination.  The ones with behavioral issues

17  are -- excuse my language -- assholes, and

18  Mr. Peterson did not act out in that manner, as I

19  recall.

20     Q.    So as far as in terms of your dealings

21  with him, he wasn't an asshole, and he

22  wasn't -- he didn't have any behavioral issues

23  with you personally; is that a correct statement?

24     A.    Yes.

25     Q.    Okay.  Would you describe Mr. Peterson

1  as difficult to deal with?

2       A.   I never actually had to deal with him,

3  because it was -- third shift is lockdown.  I

4  would go through -- when I would do the security

5  checks, he would call out, "Hey, is it time to

6  eat yet?"  And I would say, "No, you have three

7  hours left" or, "No, you have two hours left," or

8  give him the countdown.

9       Q.   So you never had any real problems with

10  Mr. Peterson?

11       A.   No, I did not.

12       Q.   And just so I understand what hours

13  third shift are, can you tell me what hours they

14  are?

15       A.   It's from 11:00 p.m. until 7:00 a.m.

16       Q.   Okay.  And also regarding how you

17  conduct your job duties, when you're performing

18  either rounds or head counts, during those hours,

19  I imagine that some inmates are sleeping during

20  those hours; is that correct?

21       A.   That is correct.

22       Q.   How do you ensure the safety and

23  wellbeing of the inmates if they're sleeping at,

24  let's say, 4:00 in the morning?

25            MR. SHEETS:  Objection.

1  BY MR. CAMPINHA-BACOTE:

2      Q.   You can answer.

3      A.   I actually look in to see if they're

4  still there.  I don't actually wake them up to

5  ask them if they're still alive or anything.

6      Q.   Okay.  And when you perform that duty,

7  are you standing inside the common area or

8  outside looking through the door window or does

9  it depend?

10     A.   For the single cells?

11     Q.   For isolation, correct.

12     A.   Yes, for the single cells, there is one

13  common area, and then the single cells are locked

14  up inside the common area, so you can be in the

15  common area and not actually be inside the cell

16  with the inmate.

17     Q.   Correct.  So let's take, for example,

18  rounds.  When you're performing rounds, how do

19  you conduct them?

20     A.   I conduct the security checks, I just --

21  they're actually key punches to signify where

22  you've been.  So I'll start off with the first

23  key punch, which is at 1 South 11.  I'll look

24  inside the dorm to see if everybody is still

25  there.  Then I'll continue to 1 South 9, which is

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1   a single cell.  I would go into the common area

2   and look into A, B, and then C.

3        Q.   1 South 9, sorry to interrupt, is that

4   where Mr. Peterson was held?

5        A.   No, Mr. Peterson I believe was in 1

6   South 2.

7        Q.   Okay.  Continue.

8        A.   To clarify, isolation is not all single

9   cells.  There are open doors.  It was the

10  medical -- or the medical wing.  1 South 11 is an

11  open dorm.  1 South 9 is a single cell dorm.

12  Then after I would exit 1 South 9, I would look

13  into 1 South 7 again to make sure everybody is

14  there, nobody's bleeding or trying to hurt each

15  other.

16            I proceed down the hallway to 1 South 4,

17  which is an open dormitory, again look inside to

18  see if everybody is there, and then I would

19  proceed into 1 South 2, which is a single cell

20  dormitory, and I would go into the common area

21  and I would look into the windows to make sure

22  everybody was still there.

23            And I would exit 1 South 2, continue

24  down the hallway to 1 South 3 and 5, both of

25  which are single cell, and I would proceed into

1  5, look into the single cells, exit 5 and enter

2  3, go into the common rea, look into the single

3  cells, and then go to 1 South 1, which is at the

4  L in the hallway.  That's also a single cell

5  dormitory, so I could enter the common area

6  there, and I would look into the single cells.

7      Q.   About how long would that take to do all

8  of that?

9      A.   That, about eight to ten minutes.

10     Q.   Okay.  So pretty quick?

11     A.   Yes.

12     Q.   How many rounds do you have to do during

13  your shift?

14     A.   We're required to do one round per hour.

15     Q.   One round per hour.  Was that a

16  requirement during the time period of Mr. Edward

17  Peterson's stay?

18     A.   Yes.

19     Q.   Okay.  Now, when you entered the common

20  area of -- let's just focus on 2 where

21  Mr. Peterson was being held.  You would enter the

22  common area, correct?

23     A.   That is correct.

24     Q.   Would you walk up to the cell door and

25  look in or what specifically would you do to

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    ensure that the inmates were safe, sound, and not

2    in any type of medical condition?

3          MR. SHEETS:  Objection.

4    BY MR. CAMPINHA-BACOTE:

5          Q.   You can answer.  Unless your attorney

6    instructs you not to answer, you can answer.

7          A.   I would focus on the security, like if

8    they were hanging, then yes, I would do something

9    about it, but if they were in their bed laying

10   down, I would assume they were asleep and

11   continue.

12         Q.   So you wouldn't, like, bang on the door

13   or anything like that and make sure they woke up

14   real quick and then -- and then went back; you

15   would just take a look through the cell and make

16   sure that they were not doing anything

17   suspicious?

18         A.   Correct.

19         Q.   Okay.  Now, walk me through the head

20   counts.  I understand you had to do three of them

21   during your shift, correct?

22         A.   That is correct.

23         Q.   Okay.  How did that differ, if at all,

24   from conducting rounds in terms of what you did?

25         A.   For the head count, you physically enter

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1    the dorm and count the individuals.  For single

2    cells, it's obviously easy.  They're in single

3    cells, they're by themselves.  For the third

4    count is normally doing tray pass.  We'll have

5    the flow counts in front of us so we can identify

6    them as we hand them a tray.  And then the third

7    would be after I took them to court, I would come

8    back through.

9        Q.   So again, same question.  Would you go

10   up to the individual cell door and get a response

11   from the inmate side or would you again just

12   visibly observe?

13       A.   From the beginning head count and the

14   ending head count, I would observe.  For the tray

15   pass head count, I likely have them to respond to

16   me to get the food.

17       Q.   Because you're handing a tray of food to

18   them, correct?

19       A.   Correct.

20       Q.   Okay.  Understood.

21            Do you know who makes the determination

22   of who goes into isolation?

23       A.   That would depend on either Doug Hahn or

24   the supervisor, the shift supervisor.

25       Q.   And the shift supervisor being -- is it

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1  many people or is it a certain person?

2      A.   It would be whoever the -- well, the

3  shift supervisor would be either be the

4  lieutenant or the sergeant or the highest ranking

5  supervisor in the facility.

6      Q.   And that changed --

7      A.   On that shift.

8      Q.   On a day-to-day basis, that changed?

9      A.   That changed, yes.

10      Q.   Now, you talked a little bit about the

11  layout of the cells in isolation, specifically

12  referring to IS2 where Mr. Peterson was being

13  held.  Where exactly, if you can recall, was

14  Mr. Peterson's cell located?  And for point of

15  reference, if you want to talk from the point of

16  view of the door that you enter into the common

17  area.

18      A.   As I enter in the common area, I'm not

19  exactly sure, I think it was the third door in.

20      Q.   On the left or the right?

21      A.   On the left.

22      Q.   Okay.  In your opinion, if you were to

23  stand outside the door leading into the common

24  area, could you view Mr. Peterson's cell from

25  that standpoint, from that perspective?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1        A.    If I'm standing outside 2, yes, you

2    could see his cell.

3        Q.    How much of his cell, if you could

4    estimate, could you see?

5        A.    You could see the cell door, and there

6    is three window slots, and you can see the

7    wall -- well, it would be from an angle.

8        Q.    So there was a slight angle because this

9    is the third one on the left, correct?

10       A.    Correct.

11       Q.    So if you had to approximate, and if you

12   don't feel comfortable giving me an answer just

13   let me know, but what percentage of the cell, for

14   example, was not viewable from that standpoint?

15       A.    Couldn't tell you.

16       Q.    Could you see over half the inside of

17   the cell from standing outside the door?

18           MR. SHEETS:  Objection.  You can answer.

19           THE WITNESS:  You couldn't see half the

20   cell.

21   BY MR. CAMPINHA-BACOTE:

22       Q.    Okay.  So less than half?

23       A.    Yes.

24       Q.    So theoretically if an inmate such as

25   Mr. Peterson were standing in the half of the

1    cell that you couldn't see, then there would be

2    no way of ensuring whether or not he was safe?

3              MR. SHEETS:  Objection.  You can answer.

4              THE WITNESS:  No, you couldn't be

5    able -- if you couldn't see him, you couldn't

6    guarantee his safety.

7    BY MR. CAMPINHA-BACOTE:

8      Q.   Now, let's talk about the two instances

9    where you stated previously that you cleaned

10   Mr. Peterson's cell.

11             Can you recall cleaning Mr. Peterson's

12   cell?

13     A.   I don't recall stating that I cleaned

14   his cell.

15     Q.   Okay.  I'm sorry.  Let me rephrase.

16             Do you recall seeing Mr. Peterson's cell

17   in a condition that needed to be cleaned?

18             MR. SHEETS:  Objection.  You can answer.

19             THE WITNESS:  I've seen his cell messy

20   but nothing dire requiring immediate action.

21   BY MR. CAMPINHA-BACOTE:

22     Q.   Okay.  And when you sat down for your

23   interview with Sergeant D'Errico, did he show you

24   pictures of Mr. Peterson's cell?

25     A.   Yes.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      Q.   Okay.  Do you recall if those pictures

2   were black and white or in color?

3      A.   I believe they were in color.

4      Q.   They were in color.

5           MR. CAMPINHA-BACOTE:  Can we mark this

6   as an exhibit?

7                      - - -

8           Thereupon, Exhibit No. 12 was marked for

9           purposes of identification.

10                     - - -

11          MR. CAMPINHA-BACOTE:  I'll hand this to

12  you first, Scott.  It's what you gave me moments

13  ago.  Do you want to take a look?  I don't think

14  there were copies made.

15          MR. YOSOWITZ:  I've seen them, I think.

16          MR. CAMPINHA-BACOTE:  We'll make copies

17  at the end, if you like.

18          MR. SHEETS:  That's fine.

19  BY MR. CAMPINHA-BACOTE:

20      Q.   Mr. Neely, I'm handing you what's been

21  marked as Exhibit 12, if you can just take a look

22  through all of those photos, and let me know if

23  any of those photos were the ones that you saw

24  when you were interviewed by Sergeant D'Errico.

25      A.   I believe these two (indicating).

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      Q.   Okay.  These two right here

2  (indicating)?

3      A.   Correct.

4           MR. CAMPINHA-BACOTE:  I'm going to mark

5  these for the record.  Please let the record

6  reflect that Mr. Neely is referring to Pages 3

7  and 4 of Exhibit 12.

8           MR. SHEETS:  One second.  These aren't

9  stapled, so we probably ought to staple them now

10 since you're referring to Page 3 and 4, and

11 they're just paper clipped because if they get

12 mixed up --

13          MR. CAMPINHA-BACOTE:  Sure, and I'll

14 also put Pages 3 and 4 on there.

15 BY MR. CAMPINHA-BACOTE:

16     Q.   Mr. Neely, I've written Page 3 and

17 Page 4 on the two pictures you've identified.

18          Can you just confirm real quick for the

19 record that those are the two pictures that

20 you've identified as seeing when you were

21 interviewed by Sergeant D'Errico?

22     A.   They are.

23     Q.   Do you recall what your testimony was

24 when you spoke to Mr. D'Errico -- or Sergeant

25 D'Errico about whether or not this was the

1    condition that you viewed Mr. Peterson's cell in

2    when you conducted rounds or head count?

3              MR. SHEETS:  Objection.  You can answer.

4              THE WITNESS:  I do not recall.

5    BY MR. CAMPINHA-BACOTE:

6        Q.   Okay.  That's fine.  Remembering back in

7    terms of the condition of Mr. Peterson's cell,

8    what's your opinion on the condition of that

9    cell?

10             MR. SHEETS:  Objection.

11             MR. YOSOWITZ:  Objection.

12             MR. SHEETS:  You can answer.

13   BY MR. CAMPINHA-BACOTE:

14       Q.   You can answer.

15             MR. SHEETS:  Sorry.

16             THE WITNESS:  My opinion would be that

17   it was messy.

18   BY MR. CAMPINHA-BACOTE:

19       Q.   Did it look like a condition similar to

20   Page 3 and 4 of Exhibit 12?

21             MR. SHEETS:  Objection.  You can answer.

22             THE WITNESS:  No.

23   BY MR. CAMPINHA-BACOTE:

24       Q.   No in terms of it was messier or not as

25   messy?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1       A.    No, it was not as messy.

2       Q.    Do you feel that Mr. Peterson's cell

3  when you witnessed it was in an acceptable

4  condition?

5            MR. SHEETS:  Objection.  You can answer.

6            THE WITNESS:  No, I did not.

7  BY MR. CAMPINHA-BACOTE:

8       Q.    In fact, that's what you stated to

9  Sergeant D'Errico, correct?

10      A.    I don't --

11      Q.    You don't recall?

12      A.    No.

13      Q.    That's fine.  So when you found -- let

14  me back up.

15           Can you remember the dates and/or date

16  that you found Mr. Peterson's cell in -- I'll use

17  your words -- in unacceptable condition?

18           MR. SHEETS:  Objection.

19           THE WITNESS:  No, I can't remember the

20  dates.

21  BY MR. CAMPINHA-BACOTE:

22      Q.    Okay.  Do you remember what you did when

23  you found his cell in the condition you stated

24  you found it in?

25      A.    When I would see his cell was messy, I

1    would just pass it on to first shift to say hey,

2    he needs to sweep it out.

3        Q.   Okay.  And why did you do that?  Why

4    would you pass it on to first shift as opposed to

5    cleaning it yourself?

6        A.   Issues of security and manpower.  I

7    worked isolation by myself, and it wasn't

8    imperative because it wasn't life-threatening, so

9    I would pass it on to first shift that was better

10   staffed and able to handle it.

11       Q.   Could you have taken care of the

12   situation if you wanted to?

13       A.   In violation of our procedures, yes, I

14   could have.

15       Q.   What do you mean by "in violation of our

16   procedures"?

17       A.   Third shift is lockdown.  We're not to

18   have any inmates out unless they're going to

19   medical or being released.  For me to enter that

20   cell, I wouldn't have a supervisor present, and I

21   couldn't do that.

22       Q.   Could you have asked for a supervisor to

23   accompany you?

24       A.   Yes, I could have.

25       Q.   And in that situation, to the best of

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1   your memory, why didn't you call a supervisor?

2       A.   Like I said, due to staffing, we're very

3   short-staffed, and that was not a very high

4   priority.

5       Q.   So you had other priorities at the time?

6       A.   Correct.

7       Q.   Okay.  Do you recall whether or not

8   Mr. Peterson had a mattress in his cell when you

9   went in?

10      A.   When I went in to do --

11      Q.   Not went in, but when -- this

12  circumstance that you're referencing, do you

13  recall if Mr. Peterson had a mattress?

14      A.   Okay.  You got to be a little bit more

15  specific.

16      Q.   Let me narrow the time frame, I'm so

17  sorry.

18           You stated that there was at least one

19  or two occasions where you witnessed

20  Mr. Peterson's cell in an unacceptable condition,

21  correct?

22           MR. SHEETS:  Objection.  You can answer.

23           THE WITNESS:  It was messy, yes.

24  BY MR. CAMPINHA-BACOTE:

25      Q.   Well, you said it was not acceptable,

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    correct?  You said that his cell was not

2    acceptable, the condition of his cell?

3              MR. SHEETS:  Objection.  You can answer.

4              THE WITNESS:  Okay.  When did I say it

5    was not acceptable?

6    BY MR. CAMPINHA-BACOTE:

7         Q.   Moments ago, I asked you if you thought

8    the condition of Mr. Peterson's cell was

9    acceptable, and you said no.

10        A.   Okay.

11        Q.   On those instances that you're referring

12   to when you saw Mr. Peterson's cell and it was

13   not acceptable to you, do you recall there being

14   a mattress in Mr. Peterson's cell?

15        A.   I recall two instances where he did not

16   have a mattress in his cell.

17        Q.   Okay.  And what did you do when you

18   discovered that?

19        A.   On both instances I gave him a mat.

20        Q.   Okay.  Did you document this?

21        A.   I did not document it.

22        Q.   And why didn't you document this?

23        A.   It was something you do during the day.

24   I saw a problem, corrected it, and kept on

25   moving.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      Q.   I'm going to back up just a quick second

2   with respect to the condition of Mr. Peterson's

3   cell.  You told me moments ago that you would

4   pass on to first shift because you were

5   understaffed and things of that nature.

6           In those circumstances, do you know if

7   first shift actually cleaned up the mess that was

8   in Mr. Peterson's cell?

9           MR. SHEETS:  Objection.  You can answer.

10          THE WITNESS:  I do not know.

11   BY MR. CAMPINHA-BACOTE:

12      Q.   Did you relay the information to

13   first -- to staff on first watch?

14      A.   Yes, I verbally passed it on.

15      Q.   Do you recall in either instance who you

16   passed it on to?

17      A.   No, I do not.

18      Q.   Would it help if you took a look at the

19   schedule as to who was working first shift as to

20   names of who you passed it on to?

21      A.   Possibly if the schedule is correct,

22   then yeah.

23      Q.   Okay.  If you want to go back to

24   Exhibit 2 and turn to Page 7, and you can see

25   that, again, there were 16 instances where you

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1  were assigned to isolation post, and if you can

2  look through and see if this schedule helps

3  refresh your recollection as to who you reported

4  the condition of Mr. Peterson's cell to.

5         MR. SHEETS:  I'm going to object.  I

6  don't have a problem with the question at all,

7  but we don't know if this is accurate.  He's

8  testified he doesn't remember.  That's the only

9  basis.

10  BY MR. CAMPINHA-BACOTE:

11      Q.  That's fine.  To the best of your

12  memory.

13      A.  I do not recall, because I don't really

14  know the dates.

15      Q.  That's fine.  That's fine.

16         Now, in terms of the mess that was in

17  Mr. Peterson's cell, can you recall exactly what

18  was in his cell that made you think it was messy?

19      A.  He had torn up Styrofoam trays.

20      Q.  I imagine that was from lunch from tray

21  pass from the --

22      A.  That was from tray pass.

23      Q.  Okay.  Anything else?

24      A.  I don't remember now.

25      Q.  What about food on the ground?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      A.    No, I don't remember.

2      Q.    What about liquid, whether that's

3   something like spilled milk or something like

4   urine, or vomit?

5      A.    I don't know.

6      Q.    What about feces?

7      A.    No.

8      Q.    Was there an odor coming from the cell

9   when you observed that it was messy?

10     A.    I don't remember.

11     Q.    So just so I can understand what you

12  meant by it was messy and unacceptable, if it was

13  just Styrofoam or stuffing, what about that made

14  it unacceptable to you?

15     A.    Because it's not neat, it's not clean.

16     Q.    And do you recall if it was just one

17  instance that he didn't have a mattress or was it

18  your testimony there was two instance?

19     A.    There was two instances.

20     Q.    And on both times you personally made

21  sure that you got him --

22     A.    I gave him a mattress, yes.

23     Q.    You stated a little while ago that one

24  of the things that you could have done with

25  respect to cleaning up Mr. Peterson's cell was to

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    notify a supervisor.  You told me that you didn't

2    think that was necessary.  But could you have

3    done anything else like notify the cleaning crew?

4              MR. SHEETS:  Objection.  You can answer.

5              THE WITNESS:  With our staffing

6    shortage, I don't believe we had a cleaning crew

7    in.

8    BY MR. CAMPINHA-BACOTE:

9         Q.   Without staffing shortage?

10        A.   With our staffing shortage.

11        Q.   Okay.

12        A.   Because we were short-staffed for the

13   longest time actually.

14        Q.   Can you recall on any of the dates that

15   you were working in Exhibit 2, Pages 7 and 8,

16   whether or not for sure there was a staff

17   shortage?

18        A.   On third shift, yes.

19        Q.   And which dates, or all?

20        A.   We actually had been short-staffed until

21   the recent hiring group that was last June -- was

22   that last June -- no, February.  Until then we

23   were operating on a short staff.

24        Q.   Now, when you say short-staffed, does

25   that mean if there was an issue such as cleaning

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1     a cell or something like that, that they won't be

2     able to get to it or it's just more difficult for

3     them to get to it?

4              MR. SHEETS:  Objection.  You can answer.

5              THE WITNESS:  When we're short-staffed,

6     our focus is on the security and the superfluous

7     items like the cleaning crew and things are just

8     put off.

9     BY MR. CAMPINHA-BACOTE:

10        Q.   Okay.  I'm going to ask you a general

11    opinion just to get your opinion.

12        A.   Sure.

13        Q.   Do you think there would ever be a

14    situation where an inmate's cell is so unclean or

15    messy that it could pose a safety concern?

16             MR. SHEETS:  Objection.

17             MR. YOSOWITZ:  Objection.

18             THE WITNESS:  No.

19    BY MR. CAMPINHA-BACOTE:

20        Q.   Let's take Exhibit 12.  This condition

21    right here, do you think that this could pose a

22    safety concern to any inmate?

23             MR. SHEETS:  Objection.  You can answer.

24             THE WITNESS:  No, just sweep it out.

25    BY MR. CAMPINHA-BACOTE:

1      Q.   Okay.  Were you aware that in this

2  circumstance an actual bio alert was issued

3  because of that condition of the cell?

4      A.   No.

5           MR. SHEETS:  Objection.  You can answer.

6           THE WITNESS:  No.

7  BY MR. CAMPINHA-BACOTE:

8      Q.   You were not aware?

9      A.   I was not aware.

10      Q.   Okay.  Would you agree to the best of

11  your knowledge, I'm not saying you're a doctor or

12  anything like that, that a bio alert is probably

13  something serious in terms of safety and health?

14           MR. SHEETS:  Objection.

15           MR. YOSOWITZ:  Objection.

16           MR. SHEETS:  You can answer.

17           THE WITNESS:  I have no idea what a bio

18  alert is, so no, I couldn't tell you.

19  BY MR. CAMPINHA-BACOTE:

20      Q.   Okay.  So just so I understand your

21  testimony here today, it's that with respect to

22  the cleanliness of a cell, there is no amount of

23  uncleanness that could pose a safety issue for an

24  inmate?

25           MR. SHEETS:  Objection.  You can answer,

1  if you now.

2        THE WITNESS:  Honestly say, not really.

3  BY MR. CAMPINHA-BACOTE:

4    Q.   Okay.  What about with respect to the

5  objects that staff gives inmates such as

6  utensils, mattresses, things like that, could

7  usage of those items ever pose a security issue?

8        MR. SHEETS:  Objection.

9        THE WITNESS:  Yes.

10 BY MR. CAMPINHA-BACOTE:

11   Q.   Okay.  So you would admit that it is

12 possible for an inmate to pose a safety issue to

13 himself given the items he receives during his

14 care?

15       MR. SHEETS:  Objection.  The previous

16 question said security issue, but you can answer.

17       THE WITNESS:  A matter of security, yes,

18 the inmate can use those items.  A measure of

19 safety, I don't think so, no.

20 BY MR. CAMPINHA-BACOTE:

21   Q.   And just so I understand what you mean

22 by "safety," what do you mean?

23   A.   By "safety," I mean, well, the inmate

24 posing a threat to themselves, no.

25   Q.   Okay.  And "security," how are you

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    defining that?

2        A.    Security as in the security of the

3    facility, preventing us from actually checking on

4    them to make sure they're still in the cell or

5    things of that nature.

6        Q.    Okay.  So when you state that yes, it

7    could provide -- cause a security issue, what

8    specifically are you referring to?

9        A.    Security, specifically they can use

10   instruments to stuff the locks or break out the

11   windows.

12       Q.    Okay.  Referring back to the pictures

13   that are before you, Page 3 and Page 4, does it

14   surprise you that the cell was in this condition

15   on September 4th, 2011?

16           MR. YOSOWITZ:  Objection.

17           MR. SHEETS:  You can answer.

18           THE WITNESS:  No, not really.

19   BY MR. CAMPINHA-BACOTE:

20       Q.    And why does that not surprise you?

21       A.    Because Mr. Peterson would tear up his

22   trays.

23       Q.    But you would acknowledge here that it's

24   more than just torn-up trays?

25           MR. SHEETS:  Objection.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

```
 1   BY MR. CAMPINHA-BACOTE:
 2        Q.   Or is it your position here that these
 3   are just pictures of torn-up trays?
 4        A.   I can see more than torn-up trays.
 5        Q.   Okay.  And let me just -- just so I can
 6   have your observations on record, what all do you
 7   see in this picture?
 8        A.   I see torn-up trays, milk carton, it
 9   looks like a wrapper of some sort, a blanket, and
10   stains on the floor.
11        Q.   Can you depict or discern what those
12   stains are from?
13             MR. SHEETS:  Objection.
14             THE WITNESS:  No, I cannot.
15   BY MR. CAMPINHA-BACOTE:
16        Q.   Okay.  Anything else?
17        A.   That's it.
18        Q.   What about looking at any other pictures
19   in terms of what you can notice, anything else?
20        A.   From the top pictures, like food around
21   the toilet.
22        Q.   Does that look like food or feces?
23             MR. SHEETS:  Objection.  You can answer.
24             THE WITNESS:  It looks like food.
25   BY MR. CAMPINHA-BACOTE:
```

1      Q.    Okay.

2      A.    Right here, on the toilet bowl?

3      Q.    Um-hmm.

4      A.    It looks like food.

5      Q.    Okay.  Anything else in the pictures?

6      A.    That is all.

7      Q.    Now, you stated that -- strike that.

8            The instances that you observed

9   Mr. Peterson's cell in the condition you

10  described earlier, did you actually enter the

11  cell?

12     A.    Enter into his cell?

13     Q.    Correct.

14     A.    No, I did not.

15     Q.    Was his cell ever opened?

16           MR. SHEETS:  Objection.  You can answer.

17           THE WITNESS:  Yes, when I -- both

18  instances when I gave Mr. Peterson a bath, I

19  opened his door to do so.

20  BY MR. CAMPINHA-BACOTE:

21     Q.    What about during tray pass, did you

22  have his cell door open to do that?

23     A.    No, we do food tray pass through the

24  food traps located inside the doors.

25     Q.    Gotcha.  So even though you did tray

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1   pass rounds or a head count 16 times according to

2   the schedule, only two of those instances you

3   actually opened -- had the door opened?

4       A.   Correct.

5       Q.   Okay.  Did any other deputy or

6   supervisor inform you of the condition of

7   Mr. Peterson's cell?

8           MR. SHEETS:  Objection.

9           THE WITNESS:  Not that I recall, no.

10  BY MR. CAMPINHA-BACOTE:

11      Q.   No one else told you it was in a bad

12  condition?

13      A.   No, not that I remember, no.

14      Q.   When you observed it in a not acceptable

15  condition at some point in time during your

16  shifts, that was the first time you had been made

17  aware of that?

18          MR. SHEETS:  Objection.  You can answer.

19          THE WITNESS:  When I would go through

20  and see it, yes.

21  BY MR. CAMPINHA-BACOTE:

22      Q.   Right.  So prior to -- let's take the

23  first time you saw this cell as being in a bad

24  condition or an unacceptable condition.  Prior to

25  that first time, had you ever been made aware of

1     the condition of Mr. Peterson's cell?

2             MR. SHEETS:  Objection.  You can answer.

3             THE WITNESS:  Are you asking me if

4     someone said, "Hey, Neely, his cell needs to be

5     cleaned out"?

6     BY MR. CAMPINHA-BACOTE:

7        Q.   Something like that.

8        A.   Not that I can recall, no.

9        Q.   Or something like, "Hey, Peterson's got

10    a, you know, pretty bad cell, someone should

11    clean it up"?

12       A.   Not that I recall, no.

13       Q.   And the difference between those two

14    statements, just so you're clear, I'm not

15    asking -- I'm not limiting that question to

16    someone actually telling you.  You could also

17    have overheard something about the cleanliness of

18    Mr. Peterson's cell with other deputies.

19            So none of that, as far as you know?

20       A.   No.

21       Q.   What about with respect to the mattress,

22    had you ever heard of Mr. Peterson being without

23    a mattress apart from your physical and personal

24    observations?

25       A.   No.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      Q.   Anyone else with you when you observed

2    Mr. Peterson's mattress not being in the cell?

3      A.   No.

4      Q.   And, again, going back to when you

5    personally saw Mr. Peterson's cell in a not

6    acceptable condition, on a scale of one to ten,

7    one being clean, ten being extremely messy, in

8    your opinion, how would you rank that?

9           MR. SHEETS:  Objection.  You can answer.

10          THE WITNESS:  My personal opinion, I

11   rate it about a three.

12   BY MR. CAMPINHA-BACOTE:

13     Q.   A three meaning?

14     A.   Three as in level of messiness, not

15   really high, because when I saw it, it was just

16   pieces of Styrofoam.

17     Q.   Okay.  Do you report to your supervisor

18   cells that are fairly clean?

19          MR. SHEETS:  Objection.

20          MR. YOSOWITZ:  Objection.

21          MR. SHEETS:  You can answer.

22          THE WITNESS:  No.

23   BY MR. CAMPINHA-BACOTE:

24     Q.   Okay.  Yet in this circumstance, you

25   thought that it merited a heads-up to the first

1    staff -- to the first shift staff?

2        A.    Correct.

3        Q.    So would it be safe to say then that

4    anything that would be on a three to ten on your

5    scale of messiness would warrant telling the

6    supervisors that, "Hey, this cell needs to be

7    cleaned"?

8            MR. SHEETS:  Objection.  You can answer

9    if you understand.

10           THE WITNESS:  I understand your question

11   to be if I ever see a cell that's messy, will I

12   pass it on to first shift?  Yes, I would.

13   BY MR. CAMPINHA-BACOTE:

14       Q.    Okay.  So let's just say in the

15   situation you gave, if a cell was a level one in

16   terms of messiness, would you report that to your

17   supervisor?

18       A.    No.

19       Q.    What about a level two?

20       A.    No.

21       Q.    But you're saying a level three and

22   above you would?

23           MR. SHEETS:  Objection.  You can answer.

24           THE WITNESS:  I would not report it to

25   my supervisor.  I would report it to the deputies

MCGINNIS & ASSOCIATES, INC.
614.431.1344 COLUMBUS, OHIO 800.498.2451

1  that are relieving me because they could handle

2  it because they do the cleaning supplies.

3  BY MR. CAMPINHA-BACOTE:

4      Q.   Okay.  Same question just so we're

5  clear.  On a scale of one to ten, if it was a one

6  or a two, would you report that off, or tip off

7  the deputies for a one or two?

8      A.   I would pass it on if the cells were

9  messy.  I would say, hey, such and such cell's

10  messy.

11      Q.   So no matter -- as long as there was

12  some type of a mess there, you would pass it on?

13      A.   That is correct.

14      Q.   And that's probably a good practice,

15  right?

16          MR. SHEETS:  Objection.  You can answer.

17          THE WITNESS:  Yes.

18  BY MR. CAMPINHA-BACOTE:

19      Q.   Are you aware if any other deputies held

20  the same belief in terms of passing on knowledge

21  of the condition of an inmate's cell if it were

22  unclean?

23          MR. SHEETS:  Objection.  You can answer.

24          THE WITNESS:  I don't know.

25  BY MR. CAMPINHA-BACOTE:

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      Q.   Are you aware of any other inmate's cell
2  in isolation that had a problem with cleanliness
3  in terms of the condition of his cell?
4           MR. SHEETS:  Objection.  You can answer.
5           THE WITNESS:  For a lot of our mental
6  health, it's commonly messy.
7  BY MR. CAMPINHA-BACOTE:
8      Q.   Okay.  But specifically anyone that you
9  can remember between the dates of August 5th,
10  2011 and September 4th, 2011?
11     A.   No, not specifically.
12     Q.   Okay.  You've been at the jail for a
13  while, right, for 15 years or so?
14     A.   15 years, yes.
15     Q.   Let's just take up until Mr. Peterson's
16  stay which would be in 2011.  Have you ever
17  encountered a cell that was as dirty or dirtier
18  than Mr. Peterson's cell?
19           MR. SHEETS:  Objection.  You can answer.
20           THE WITNESS:  Yes, I have.
21  BY MR. CAMPINHA-BACOTE:
22     Q.   Okay.  And if we go back to that same
23  scale that I gave you beforehand, one to ten, one
24  being clean, ten being very messy, what's the
25  messiest you've seen a cell?

1          MR. SHEETS:  Objection.  You can answer.

2          THE WITNESS:  In my opinion, the

3    messiest I've seen would be about seven.

4    BY MR. CAMPINHA-BACOTE:

5          Q.   Okay.  And describe to me what a seven

6    would look like.

7          A.   A seven would be feces on the windows,

8    say several days of trays just torn and shredded,

9    and food smeared on the walls.

10          Q.   And you've seen that before, right?

11          A.   I have seen that before.

12          Q.   So you've seen several days of trays

13    sitting in an inmate's cell and feces smeared on

14    the wall?

15          A.   Not several days of trays.  Trays from

16    several days.  Let me rephrase that.  They have

17    accumulated trays over several days, and they

18    tear those up.

19          Q.   Furthering that example, how many sevens

20    have you seen in your 15 years?

21          MR. SHEETS:  Objection.  You can answer.

22          THE WITNESS:  I have no idea.

23    BY MR. CAMPINHA-BACOTE:

24          Q.   More than ten?

25          A.   I work in isolation.  I would see a lot

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1   of whatever it is.  I couldn't begin to tell you

2   how many times.

3        Q.   So so many you can't even really keep

4   track of it?

5        A.   That is correct.

6        Q.   I understand then when we're talking

7   about the picture identified in Exhibit 12, that

8   this picture on Pages 3 and 4 you did not

9   personally see?  These are pictures from

10  September 4th, 2011.  You understand that,

11  correct?

12       A.   That's correct.

13       Q.   Now, taking a look at these pictures,

14  how would you rank this?

15            MR. SHEETS:  Objection.  You can answer.

16            THE WITNESS:  I would still put it at a

17  three.

18  BY MR. CAMPINHA-BACOTE:

19       Q.   Okay.  And you acknowledge there is no

20  mattress in any of those pictures?

21            MR. SHEETS:  Objection.  You can answer.

22            THE WITNESS:  I do not see a mattress in

23  the pictures.

24  BY MR. CAMPINHA-BACOTE:

25       Q.   Okay.  And I may have asked this before,

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    and if I did, I apologize.  Were you aware of

2    Mr. Peterson having a history of destroying his

3    mattress?

4        A.   Yes.

5        Q.   You were aware, okay, I'm sorry.  Tell

6    me how you became aware of that.  I know you

7    stated that there were two separate instances

8    where you personally witnessed him without a

9    mattress, but anything else you want to add to

10   your knowledge of his destroying the mattress?

11       A.   Normally when they destroy a mattress,

12   we take the mattress from them.  So if a person

13   didn't have a mattress, I'd assume that he had

14   destroyed the previous one and get him a new one.

15       Q.   So you assumed.  Did you have any

16   personal knowledge of whether or not someone

17   actually took away Mr. Peterson's mattress for

18   destroying it?

19       A.   No, I did not have any personal

20   knowledge of that.

21       Q.   Okay.  There was never an instance where

22   second shift tipped you off and said, "Hey, by

23   the way, I took away Peterson's mattress, I just

24   want you to know"?  Anything like that ever said

25   to you?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      A.    No.

2      Q.    Okay.  If you can remember, I know again

3   we're talking about two years ago or so, but

4   let's talk about the time frame with

5   Mr. Peterson's stay.

6           Any other inmates that you're aware of

7   that had an issue with the cleanliness of their

8   cell during that time frame?

9           MR. SHEETS:  Objection.  You can answer.

10          THE WITNESS:  In my opinion, they're all

11  messy.  So if anyone stood out, no -- anyone in

12  particular stood out, no.

13  BY MR. CAMPINHA-BACOTE:

14     Q.    Okay.  Would you, in your opinion, say

15  that the condition of Mr. Peterson's cell that

16  you observed it in was on par with the other

17  inmates in isolation in terms of cleanliness?

18          MR. SHEETS:  Objection.  You can answer.

19          THE WITNESS:  I would say as on par, but

20  there were some that I considered, in my opinion,

21  messy.

22  BY MR. CAMPINHA-BACOTE:

23     Q.    Okay.  Now, you talked about your

24  interaction with Mr. Peterson and how he really

25  didn't give you too much problem.  Were you aware

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1   of him giving any other deputy or staff member

2   problems?

3        A.    No.

4        Q.    Okay.  You stated earlier that you're

5   familiar with who Lieutenant D'Errico is,

6   correct?

7        A.    Correct.

8        Q.    What's his position?  What does he do?

9        A.    He's a sergeant with the internal

10  affairs division.

11       Q.    Okay.  And again, you recall the

12  interview he gave you on or around January 26th,

13  correct?

14       A.    I remember attending it, yes.  Exactly

15  what we talked about, I probably --

16       Q.    Well, let's refresh your recollection.

17  Go back to Exhibit 2, which is right in front of

18  you, and if you can turn to Page -- I believe

19  it's 41, but let me double-check.  Actually, that

20  was not 41.  Page 10.

21       A.    Okay.

22       Q.    If you look, almost the middle, just a

23  little bit underneath, you'll see your name on

24  January 25th, 2012, "Deputy Damien Neely was

25  interviewed."  Do you see that?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      A.    I see that.

2      Q.    Take a moment and just read through that

3  statement, and let me know when you're finished.

4      A.    I'm finished reading.

5      Q.    Okay.  Had you ever read that before?

6      A.    No.

7      Q.    Okay.  Let's take the statements that

8  were made in that paragraph.  We can go line by

9  line if you need to, but do you disagree with

10  anything that's stated there?

11          MR. SHEETS:  Objection.  You can answer.

12          THE WITNESS:  A lot of it is personal

13  opinion, but no, I don't.

14  BY MR. CAMPINHA-BACOTE:

15      Q.    Okay.  Do you disagree with any of the

16  personal opinions?

17      A.    No.

18      Q.    Okay.  You're aware that Sergeant --

19  excuse me -- Lieutenant D'Errico ended up

20  recommending disciplinary action -- disciplinary

21  action against you for what he recorded in that

22  statement you just read, correct?

23      A.    No, I did not.

24      Q.    Okay.  Well, let me show it to you.  If

25  you can turn to Page 41.  Take a look at that,

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    and let me know when you're done reading.

2         A.    I'm finished reading.

3         Q.    Okay.  Prior to reviewing it right now,

4    were you aware that Mr. -- excuse me --

5    Lieutenant D'Errico recommended these three

6    violations for your conduct concerning the time

7    frame of Mr. Peterson's incarceration?

8         A.    The exact, no.  I received a letter

9    saying that I was being considered for discipline

10   in regards to the Peterson incident.

11        Q.    And that letter was nothing you saw in

12   this Exhibit 2 that you have in front of you?

13   And you can take a chance to review all of it.

14             MR. SHEETS:  If you wouldn't mind, when

15   you finish with your current topic, can we take a

16   break?

17             MR. CAMPINHA-BACOTE:  Sure.  Absolutely.

18             THE WITNESS:  No, that was our final

19   disposition.

20   BY MR. CAMPINHA-BACOTE:

21        Q.    What was your final disposition?

22        A.    After the IA investigation, I received

23   final disposition as to whether or not I would

24   receive discipline or not, and that was a letter.

25        Q.    Okay.  Understood.  I think we might

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    have that here.  I'm going to refer to an

2    exhibit.  Give me two seconds.

3              All right.  I'm handing you what's been

4    marked as Exhibit 3, and I'm directing you to one

5    of the pages in here.  You take a look at that

6    real quick, and let me know when you're done

7    reviewing.

8         A.    Okay.

9         Q.    Is this that document you're referring

10   to or was it something different?

11        A.    This was the document received.

12        Q.    So referring back to Page 41, which was

13   again Lieutenant D'Errico's acknowledgments and

14   violations of the rules in your situation, do you

15   disagree with anything contained therein?

16             MR. SHEETS:  Objection.  You can answer.

17             THE WITNESS:  I would say yes.

18   BY MR. CAMPINHA-BACOTE:

19        Q.    You --

20        A.    Disagree.

21        Q.    You disagree?  What do you disagree

22   with?

23        A.    It says, "failing to take immediate

24   action" for an unclean cell as being an

25   Inattention of duty," when I actually passed it

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1   on to someone else, so that's not neglect nor

2   inattention.  Actually, since I couldn't

3   personally take care of it, I passed it on to

4   someone else to take care of.

5           For nonfeasance --

6       Q.   Well, let's take that one, and again,

7   try to speak a little slower just for the court

8   reporter.

9       A.   I'm sorry.

10          MR. SHEETS:  And if it's all right with

11  you, Avonte, you asked a question.  I would like

12  him to answer that and you can break it down.

13  BY MR. CAMPINHA-BACOTE:

14      Q.   Okay.  Go ahead, finish answering.

15      A.   For nonfeasance, same thing.  I couldn't

16  personally take care of it, but I passed it on

17  for someone else to take care of.

18  "Organizational Authority, Responsibilities, and

19  Duties of Supervisors and Staff," I don't even

20  know what that means.

21          It said I "did not record and log his

22  activity during his tour of duty in the

23  prescribed manner..."  The prescribed manner,

24  we're supposed to log our security checks and

25  significant events.  A dirty cell is not a

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1  significant event.

2      Q.   Can a dirty cell ever be a significant

3  event?

4      A.   No.

5      Q.   Even if it was a level seven as we

6  talked about before, would that be a significant

7  event?

8          MR. SHEETS:  Objection.  You can answer.

9          THE WITNESS:  If it was that bad, I

10  would notify the supervisor, but I didn't see

11  anything like that.

12  BY MR. CAMPINHA-BACOTE:

13      Q.   I understand you may not have seen it,

14  but my question is whether or not that would be a

15  significant event.

16      A.   No, I still wouldn't log it in the book.

17  Well, I would notify my supervisor, but I

18  wouldn't log it in the book.

19      Q.   What if it was a level ten?

20      A.   Still notify the supervisor, it was just

21  a dirty cell.

22      Q.   Let's take these one by one.  With

23  regard to the Neglect Or Inattention to Duty,

24  AR102:9/102:43, you at least acknowledge the

25  fact, and we talked about this earlier, that

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

 1    Mr. Peterson's cell was in a bad condition?

 2              MR. SHEETS:  Objection.

 3    BY MR. CAMPINHA-BACOTE:

 4         Q.   Correct.

 5         A.   I agree that it's messy.

 6         Q.   Well, you actually said the words "bad."

 7              MR. SHEETS:  Objection.  No, he didn't.

 8    You can answer.

 9              MR. CAMPINHA-BACOTE:  Again, no speaking

10    objections.

11    BY MR. CAMPINHA-BACOTE:

12         Q.   But, again, you acknowledge it was a

13    bad -- the condition of the cell was in bad

14    condition, correct?

15              MR. SHEETS:  Objection.  You can answer.

16              THE WITNESS:  I agree it was messy, yes.

17    BY MR. CAMPINHA-BACOTE:

18         Q.   Okay.  Is it your position here today

19    that it was not bad?

20              MR. SHEETS:  Objection.  You can answer.

21              THE WITNESS:  I think it was messy.

22    BY MR. CAMPINHA-BACOTE:

23         Q.   I'm sorry, that's not answering my

24    question.  "Yes" or "no", do you --

25         A.   Bad, in my personal opinion, was it bad?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    Not as bad as I've seen before.  But was it

2    messy?  Yes.

3        Q.   Right, and again, that's not really

4    responsive to my question.  The question was

5    whether or not you feel the condition of the cell

6    was in a bad condition.

7             I understand that there might be worse

8    or better, you know, different circumstances, but

9    was the condition of Mr. Peterson's cell bad when

10   you observed it?

11            MR. SHEETS:  Objection.

12            THE WITNESS:  In my personal opinion,

13   yes, it was bad.

14   BY MR. CAMPINHA-BACOTE:

15       Q.   Okay.  Now, I understand that you

16   disagree with the fact that you violated that

17   rule, but in terms of that statement, "Deputy

18   Neely was neglectful for knowing that

19   Mr. Peterson's cell was in a 'bad' condition and

20   failing to take immediate action," is there

21   anything factual about that statement that is not

22   accurate?

23            MR. SHEETS:  Objection.

24            MR. YOSOWITZ:  Objection.

25            THE WITNESS:  I didn't understand that

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    question.

2    BY MR. CAMPINHA-BACOTE:

3        Q.    Is there anything factual about that

4    question that is not accurate?  And we can break

5    it apart if you want to.

6        A.    Please.

7        Q.    Let's take the "'bad' condition".  You

8    acknowledge, as we've been over several times, it

9    was in bad condition.

10           The second part, "failing to take

11   immediate action," is that incorrect to state

12   that you failed to take immediate action?

13           MR. YOSOWITZ:  Objection.

14           MR. SHEETS:  Objection.  You can answer.

15           THE WITNESS:  Immediate as in -- I mean,

16   like that instant immediate or --

17   BY MR. CAMPINHA-BACOTE:

18       Q.    Well, I'm not -- you know, I didn't

19   write the words "immediate action."  I'm just

20   going off of your understanding of the word

21   "immediate."

22           Do you think it's incorrect to say that

23   you failed to take immediate action?

24       A.    I would say yes, it's incorrect.

25       Q.    Okay.  Let's go with the second one.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1          MR. YOSOWITZ:  Are we going to take a

2    break?

3          MR. CAMPINHA-BACOTE:  You said after I

4    finish this topic.

5          MR. YOSOWITZ:  You said after his

6    question.

7          MR. CAMPINHA-BACOTE:  You said topic.

8          MR. SHEETS:  That's fine as long as

9    you --

10          MR. CAMPINHA-BACOTE:  I don't have much

11   more on this topic.

12          MR. SHEETS:  Okay, that's fine.

13          MR. CAMPINHA-BACOTE:  Probably two

14   minutes.

15          MR. SHEETS:  That's fine.

16   BY MR. SHEETS:

17     Q.    Nonfeasance, the middle paragraph.

18          Do you see that?

19     A.    I see that.

20     Q.    Okay.  Let's just concentrate on the

21   words "by ignoring the condition of

22   Mr. Peterson's cell and not taking immediate

23   action."  Same question.  Would you take issue

24   with anything factual in that statement?

25          MR. SHEETS:  Objection.  You can answer.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1          THE WITNESS:  Correct.  They said I did

2    not take any action.  I notified first shift who

3    were responsible for handing out cleaning

4    supplies.

5    BY MR. CAMPINHA-BACOTE:

6       Q.   Okay.  And it's your position that

7    that's taking immediate action?

8       A.   That is an action, yes.

9       Q.   I know it's an action.

10      A.   It is.

11      Q.   But it's your conclusion that's an

12   immediate action?

13         MR. SHEETS:  Objection.  You can answer.

14         THE WITNESS:  Yes.

15   BY MR. CAMPINHA-BACOTE:

16      Q.   Okay.  And then the last one,

17   "Organizational Authority, Responsibilities, and

18   Duties of Supervisors and Staff," I'll read it.

19   "Deputy Neely did not record and log his activity

20   during his tour of duty in the prescribed manner

21   when he observed Mr. Peterson without a

22   mattress."

23         You will acknowledge that you did not

24   record and log this activity, correct?

25      A.   That is correct.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1     Q.    Okay.  With respect to -- actually,

2  strike that.

3          So would you, therefore, have any issue

4  with the recommended violation here?

5          MR. SHEETS:  Objection.  You can answer.

6          THE WITNESS:  I disagree with that also.

7  BY MR. CAMPINHA-BACOTE:

8     Q.    Okay.  What part do you disagree with?

9     A.    It says that I did not record or log

10  this activity in his tour of duty in the

11  prescribed manner.  There is no prescribed

12  manner.

13     Q.    And what do you mean by that?  I just

14  want to understand what you mean.

15     A.    For our log-ins, as I stated earlier, in

16  our logbook, we're only required to log in our

17  security counts, our security rounds, and

18  significant events, tray pass, med pass, official

19  code.  Giving someone a mattress, giving someone

20  a blanket, a cup, spoon, it's not a significant

21  event.

22     Q.    Could there ever be a situation where

23  observing one without a mattress over and over

24  again could be a significant event?

25          MR. SHEETS:  Objection.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1          MR. YOSOWITZ:  Objection.

2          THE WITNESS:  I'm going to say no.

3   BY MR. CAMPINHA-BACOTE:

4      Q.   Okay.  If someone was -- and I just want

5   your opinion on this -- if someone was repeatedly

6   destroying their mattress, let's say every time

7   you did some type of round or head count you had

8   to take some sort of action because they were

9   destroying their mattress, would that be

10  something that you would record in your isolation

11  logbook?

12          MR. SHEETS:  Objection.  You can answer.

13          THE WITNESS:  No, just notify your

14  supervisor.

15  BY MR. CAMPINHA-BACOTE:

16     Q.   Okay.  So that would not be a

17  significant event in your opinion?

18     A.   Correct.

19          MR. CAMPINHA-BACOTE:  Okay.  Take a

20  break now if you want.

21          (Recess taken.)

22  BY MR. CAMPINHA-BACOTE:

23     Q.   Deputy Neely, I don't have too much more

24  for you.  I just want to go over some things we

25  addressed earlier.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1            As it relates to Mr. Peterson, have you

2    ever had a conversation with Mr. Hahn, Mr. Doug

3    Hahn or any other mental health liaisons or

4    representatives?

5        A.   I have not, no.

6        Q.   You testified earlier about the

7    procedure that you personally do when conducting

8    rounds and head counts.  Do you remember that?

9        A.   Yes.

10       Q.   You also spoke to tray pass too, right?

11       A.   Correct.

12       Q.   I'm curious to the extent that you have

13   knowledge on this about other deputies about how

14   they perform their rounds and head counts.

15           Do you know if other deputies, if it's

16   required for them to actually enter the common

17   area when performing either a head count or a

18   round?

19           MR. SHEETS:  Objection.  You can answer.

20           THE WITNESS:  During the head counts,

21   yes.  During the security checks, no.

22   BY MR. CAMPINHA-BACOTE:

23       Q.   Head counts, yes, required to enter the

24   common area, but rounds, no?

25       A.   Correct.

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1      Q.   But you testified that with you

2  personally, you enter the common area for both

3  head counts and rounds, right?

4           MR. SHEETS:  Objection.  You can answer.

5           THE WITNESS:  Yes.

6  BY MR. CAMPINHA-BACOTE:

7      Q.   Are there ever any instances where you

8  have not entered the common area during a round?

9      A.   Yes.

10     Q.   Okay.  Can you recall if during the time

11 frame of Mr. Peterson's incarceration if you did

12 not enter the common area on any of those

13 instances where you were scheduled to work third

14 shift?

15     A.   No, I cannot.

16     Q.   So as far as you remember sitting here

17 today, each time you performed a round when

18 Mr. Peterson was being held by FCCC II you

19 entered the common area?

20          MR. SHEETS:  Objection.  You can answer.

21          THE WITNESS:  Yes, I believe so.

22 BY MR. CAMPINHA-BACOTE:

23     Q.   Okay.  Are you aware if there are any

24 other deputies like yourself who typically enter

25 the common area?

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1      A.   No, I am not aware.

2      Q.   No, as in you're not aware, or no,

3   deputies don't do that?

4      A.   No, I'm not aware of any other deputies

5   doing that.  I'm not there when they do their

6   rounds, so I really can't tell you.

7      Q.   Have you ever conducted a round with

8   another deputy?

9      A.   No.  Well, in isolation during the time

10   of that incident with Mr. Peterson, no, I was

11   normally by myself, so I would do the rounds by

12   myself.

13      Q.   Okay.  And I'm not sure if in that

14   schedule -- it would have been noted on your

15   schedule if there was another deputy on staff?

16      A.   That is correct.

17      Q.   Okay.  Just let me make sure it's in

18   here, because I know sometimes on a shift they

19   will have more than one deputy assigned, right?

20      A.   Yes, they would have more than one

21   deputy assigned.

22      Q.   And I think you're right.  I don't think

23   there is any shifts here where you were with any

24   other deputy.  Actually, I take that back.

25           Go back to Exhibit 2 in front of you,

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    Page 8, and you'll see the second entry, which is

2    Thursday, September 1st, 2011, third shift.  You

3    have your name as well as Bishop, Deputy Bishop.

4         A.   I see, yes.

5         Q.   Do you recall working with Deputy Bishop

6    on that day?

7         A.   I do not recall.

8         Q.   Do you have any reason to doubt that you

9    were or were not working with Deputy Bishop on

10   that day?

11        A.   No, I have no reason to doubt it.

12        Q.   Okay.  And, again, I'll ask the same

13   question now that you've seen his name there.

14   Are you aware if Deputy Bishop, whether or not he

15   enters the common area during performing rounds?

16             MR. SHEETS:  Objection.  You can answer.

17             THE WITNESS:  No, I do not.

18   BY MR. CAMPINHA-BACOTE:

19        Q.   Why do you enter the common area if it's

20   not required when performing rounds?

21        A.   It's a personal quirk of mine.  I just

22   like to make sure everybody is still there.

23        Q.   Okay.  So would it be accurate to say

24   you believe it's safe practice?

25             MR. SHEETS:  Objection.  You can answer.

1          THE WITNESS:  I believe it's my personal

2    practice based on I would say being in the Army,

3    just security.

4    BY MR. CAMPINHA-BACOTE:

5        Q.   Okay.  Do you believe that this practice

6    that you do personally should be a requirement of

7    all jail personnel?

8          MR. YOSOWITZ:  Objection.

9          THE WITNESS:  That would be up to the

10   sheriff to determine whether or not the check I

11   perform should be mandatory, so that decision is

12   way above my pay grade.

13   BY MR. CAMPINHA-BACOTE:

14       Q.   Okay.  I understand that the decision

15   ultimately lies with someone who is above your

16   pay grade, but with respect to your personal

17   opinion as to whether or not you think that is a

18   good practice all deputies should be required to

19   enter the common area, would you agree that

20   that's something that should be done or not?

21         MR. YOSOWITZ:  Same objection.

22         MR. SHEETS:  Objection.  You can answer.

23         THE WITNESS:  I would say yes.

24   BY MR. CAMPINHA-BACOTE:

25       Q.   Yes as in?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1          A.    Yes, they should enter.

2          Q.    Okay.  Knowing that entering common

3    cells during rounds is not required, would it

4    surprise you if I were to tell you that some

5    deputies don't enter common areas when performing

6    rounds?

7                MR. SHEETS:  Objection.  You can answer.

8                THE WITNESS:  No, it would not surprise

9    me.

10   BY MR. CAMPINHA-BACOTE:

11         Q.    Okay.  We talked about visibility from

12   outside the common area into a cell such as

13   Mr. Peterson's.  You testified that it was a

14   little over 50 percent you couldn't see just

15   because his was the third cell on the left.  Do

16   you recall that conversation?

17         A.    Yes.

18         Q.    Now I want to talk about specifically

19   what you could not see.  Let me -- strike that.

20               I want to talk about specifically what

21   you could see when looking through the door

22   entering the common area into Mr. Peterson's

23   cell.  Could you see his -- the toilet?

24         A.    We're going to rephrase, because there's

25   actually two doors.  There's the main entrance to

MCGINNIS & ASSOCIATES, INC.
614.431.1344 COLUMBUS, OHIO 800.498.2451

1  1 South 2, and then there is the actual -- the

2  cell door for the single cell.

3      Q.  Right.  So the way I understand it is if

4  you were standing outside of the door that lets

5  you enter into the common area, you would be

6  looking through two sets of doors if you wanted

7  to see Mr. Peterson, correct?  One door would be

8  the door leading to the common area, correct?

9      A.  Correct.

10     Q.  And the second door would be the actual

11  cell door for Mr. Peterson's cell, right?

12     A.  Correct.

13     Q.  So let's assume we're standing outside

14  the first door I mentioned, which is the door

15  entering the common area.

16          It's still your position here today that

17  given that clarification we just stated, there's

18  still about a little over 50 percent of

19  Mr. Peterson's cell that you would not be able to

20  see if you were looking from outside of the door

21  that enters the common area?

22          MR. SHEETS:  Objection.  You can answer.

23          THE WITNESS:  Correct.

24  BY MR. CAMPINHA-BACOTE:

25     Q.  Okay.  Same point of view, can you see

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    Mr. Peterson's toilet from that angle?

2        A.    No.

3        Q.    Can you see his bed?

4        A.    No.

5        Q.    Can you see any part of the floor?

6        A.    No.

7        Q.    So it would be --

8        A.    Inside his cell, no.

9        Q.    Inside the cell, that's what I'm talking

10   about.

11            So it would be safe to say if there was

12   excessive trash in his cell, that would not be

13   something you would be able to view from standing

14   outside the door entering into the common area?

15            MR. SHEETS:  Objection.

16            THE WITNESS:  That would be correct.

17   BY MR. CAMPINHA-BACOTE:

18       Q.    Okay.  You also testified earlier that

19   if Mr. Peterson or any inmate was in a part of

20   the cell that was not in that let's just say 50

21   percent that was viewable, you wouldn't be able

22   to see the inmate himself, right?

23       A.    That is correct.

24       Q.    Just a question, is that a reason why

25   you actually enter common cells, to make sure you

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    can actually observe the entire cell -- condition

2    of the cell, or is there another reason why you

3    normally enter the cell, enter the common area?

4              MR. SHEETS:  Objection.  You can answer.

5              THE WITNESS:  I normally enter the

6    common area just to have eyes on everyone, just

7    to make sure they're there.

8    BY MR. CAMPINHA-BACOTE:

9       Q.   That would be consistent with my

10   statement about you want to make sure you can

11   actually see whether it's the inmate or whether

12   or not there is any type of safety or security

13   issue inside the cell?

14      A.   Yes.

15      Q.   Okay.  I want to clarify something else.

16              With respect to seeing either inside the

17   common area or inside individual cells, apart

18   from the door that we spoke about that would open

19   up and goes into the common area, are there any

20   other areas of the jail that you could either

21   walk by or look through to get a view of the

22   inside of an inmate's cell in isolation, in IS2?

23              MR. SHEETS:  Objection.  You can answer.

24              THE WITNESS:  Yes.  There are windows

25   for the common area.  You can look through the

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    windows.  You can see actually into the cells.

2    You couldn't see the floor, but you could

3    actually see into it.  You'd be able to see the

4    writing desk, the rear window, and the back half

5    of the bunk.

6    BY MR. CAMPINHA-BACOTE:

7        Q.   Now, is this the same door that we were

8    talking about before in terms of how you enter

9    the common area?

10       A.   No, these are windows that are set up

11   outside the door.

12       Q.   Okay, gotcha.

13            Now, I realize that during the course of

14   this investigation you were instructed not to

15   discuss this matter with anyone else such as

16   deputies, family, friends, correct?  Do you

17   remember that instruction at all?

18       A.   I was told you can discuss it with

19   clergy and your spouse.

20       Q.   Okay.

21       A.   Beyond that, no.

22       Q.   Okay.  And did you discuss this with

23   anyone else outside of clergy and spouse?

24       A.   No, I did not.

25       Q.   Okay.  What about after the incident?

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1    Obviously you were aware of the fact that certain

2    violations were considered against you as were

3    stated in that letter I showed you earlier,

4    correct?

5        A.    Correct.

6        Q.    I know oftentimes people will get

7    together with either friends or maybe other

8    deputies that you have a close relationship with

9    and talk about things.

10            Did you ever talk about Mr. Peterson

11   with any other deputies outside of the

12   investigation?

13            MR. SHEETS:  Objection only because I

14   think we covered this.  When you started, you

15   asked him the same questions, but you can answer.

16            THE WITNESS:  No.

17   BY MR. CAMPINHA-BACOTE:

18       Q.    No?  Okay.

19            Are you aware of -- and if I asked this

20   question, again, I apologize -- other deputies

21   outside yourself talking about it, whether

22   overhearing any conversation or not?

23       A.    No.

24       Q.    Okay.  As a result of the investigation

25   and perhaps the findings of Lieutenant D'Errico,

MCGINNIS & ASSOCIATES, INC.
614.431.1344 COLUMBUS, OHIO 800.498.2451

1   were you ever instructed by a supervisor or

2   anyone on how to perform your job differently?

3          MR. SHEETS:  Objection.  You can answer.

4          THE WITNESS:  Well, in the logbook we're

5   supposed to write "security check" instead of

6   "round."  That's about it.

7   BY MR. CAMPINHA-BACOTE:

8       Q.   Okay.  With respect to cleaning, did you

9   receive any instruction on cleaning that was

10  different than how you performed your job before

11  the Peterson incident?

12         MR. SHEETS:  Objection.  You can answer.

13         THE WITNESS:  They said, "Take out the

14  trash," but I already did that, so no.

15  BY MR. CAMPINHA-BACOTE:

16      Q.   Elaborate just so I know what you mean

17  by --

18      A.   They just said take out the -- make sure

19  you trash the trash out at the end of tray pass,

20  but I already did that, so no.

21      Q.   In what form or setting was this

22  instruction given to you?

23         MR. SHEETS:  Objection.  You can answer.

24         THE WITNESS:  Roll call.

25  BY MR. CAMPINHA-BACOTE:

MCGINNIS & ASSOCIATES, INC.
614.431.1344  COLUMBUS, OHIO  800.498.2451

1       Q.   Roll call?  And I'm assuming that's with

2   everyone on your shift, the supervisor stated

3   that to everyone there?

4       A.   Yes.

5       Q.   Okay.  Can you recall about when that

6   happened?

7       A.   I cannot, no.

8       Q.   Was it this year or last year?

9           MR. SHEETS:  Rather than break up every

10  question you have with regard to this, Avonte,

11  I'm going to object to all subsequent remedial

12  measure-type stuff.

13          MR. CAMPINHA-BACOTE:  That's fine.

14          MR. SHEETS:  And I don't want to

15  interrupt your flow by objecting to every

16  question.  I do reserve the right to lodge a

17  further objection to form or something like that.

18          MR. CAMPINHA-BACOTE:  That's fine.

19          MR. SHEETS:  Okay.

20          THE WITNESS:  I do not remember when.

21  BY MR. CAMPINHA-BACOTE:

22      Q.   Okay.  And I think my question was if

23  you -- I don't know if you were saying yes, you

24  don't remember if it was 2012 or 2013 or --

25      A.   No, I don't remember what year.

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1      Q.   Okay.  Gotcha.  I apologize, I didn't

2   hear you.

3           Just one final thing.  I want to know if

4   you reviewed this.  I'm going to refer you to

5   Exhibit 5, which is the memo.  I'm handing you,

6   Deputy Neely, what's been marked as Exhibit 5.

7   If you can actually read through that entire memo

8   and let me know if you've seen this document

9   before.

10      A.   I have not.

11      Q.   You have not seen this document before?

12      A.   I have not.

13      Q.   As best as you can recall, do you

14   remember anyone ever discussing any of the

15   contents of this memo with you?

16      A.   Supervisors would say we have to do

17   single cell inspections, just make sure you clean

18   up.

19      Q.   Was that a part of roll call or

20   something outside of roll call?

21      A.   That was part of roll call.

22      Q.   Okay.  Outside of roll call, anything

23   else where someone has addressed any of the

24   issues in this memo with you?

25      A.   No.

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

1              MR. CAMPINHA-BACOTE:  Okay.  I have no

2      further questions.

3              MR. YOSOWITZ:  None from me.

4              MR. SHEETS:  He'll read.

5              (Signature not waived.)

6                      - - -

7              (Thereupon, the deposition was concluded

8               at 3:15 o'clock p.m. on Monday,

9               July 15, 2013.)

10                      - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

```
 1              A F F I D A V I T

 2                     - - -

 3     STATE OF _____,    )

 4                                  )  SS:

 5     COUNTY OF _____,    )

 6                     - - -

 7              Damien Neely, having been duly placed

 8     under oath, deposes and says that:

 9              I have read the transcript of my

10     deposition taken on Monday, July 15, 2013, and

11     made all necessary changes and/or corrections as

12     noted on the attached correction sheet, if any.

13

14

15                      _____

16                      Damien Neely

17              Placed under oath before me and

18     subscribed in my presence this _____ day of

19     _____, _____.

20

21

22                      _____

23                      Notary Public

24     My Commission Expires:  _____.

25                     - - -
```

**MCGINNIS & ASSOCIATES, INC.**
**614.431.1344  COLUMBUS, OHIO  800.498.2451**

```
 1              C E R T I F I C A T E
 2                    - - -
 3    State of Ohio,            )
                                ) SS:
 4    County of Franklin,       )
 5                    - - -
 6            I, Amy L. Miller, Registered Professional
      Reporter and Notary Public in and for the State of
 7    Ohio, hereby certify that the foregoing is a true
      and accurate transcript of the deposition
 8    testimony, taken under oath on the date
      hereinbefore set forth, of Damien Neely.
 9            I further certify that I am neither
      attorney or counsel for, nor related to or
10    employed by any of the parties to the action in
      which the deposition was taken; and further that I
11    am not a relative or employee of any attorney or
      counsel employed in this case, nor am I
12    financially interested in the action; and further
      that I am not, nor is the court reporting firm
13    with which I am affiliated, under a contract as
      defined in Ohio Civil Rule 28(D).
14
15                          _____
16                          Amy L. Miller, Registered
                            Professional Reporter and
17                          Notary Public in and for
                            the State of Ohio
18
      My Commission Expires:  October 30, 2016
19
20                    - - -
21
22
23
24
25
```