# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JOHN C. RUIZ BUENO, III, et al.,**

        **Plaintiffs,**

                          **Case No. 2:12-cv-00809**

    **v.**                          **JUDGE GREGORY L. FROST**
                                    **Magistrate Judge Terence P. Kemp**

**ZACK SCOTT, et al.,**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' motion for summary judgment (ECF No. 208),[1] Plaintiffs' response in opposition (ECF No. 223), and Defendants' reply memorandum (ECF No. 236); Defendant Douglas Edgington's motion for summary judgment (ECF No. 181), Plaintiffs' response in opposition (ECF No. 216), and Defendant Edgington's reply memorandum (ECF No. 216); and Plaintiffs' motion to strike reply to response to motion regarding evidentiary issues (ECF No. 238), Defendants' response in opposition (ECF No. 240), and Plaintiffs' reply memorandum (ECF No. 241.)  For the reasons that follow, the Court **DENIES** the motion to strike (ECF No. 238), **GRANTS** Defendant Edgington's motion for summary judgment (ECF No. 181), and **GRANTS IN PART** and **DENIES IN PART** the remaining Defendants' motion for summary judgment (ECF No. 208).

---

[1] Defendants, with the exception of Defendant Edgington, filed a combined motion for summary judgment.  (ECF No. 223.)  Defendant Edgington is represented by separate counsel and filed his own motion for summary judgment. (ECF No. 181.)  For ease of reference, and unless otherwise stated, the term "Defendants" refers to all Defendants except Defendant Edgington.

## I.    BACKGROUND

This case involves the death of Edward Peterson, who died while incarcerated at the Franklin County Correctional Center II ("FCCC").  Plaintiffs, the administrator of Peterson's estate and Peterson's son, brought a claim for Eighth Amendment violations under 42 U.S.C. § 1983, as well as state-law claims for negligent provision of medical care, wrongful death, and loss of consortium.  Plaintiffs named fifty-three defendants in this action, all of whom are employees of the Franklin County Sheriff's Office ("FCSO") who worked in the FCCC section where Peterson was confined.  The facts underlying Peterson's death are as follows.

On August 5, 2011, Peterson was arrested on misdemeanor charges and admitted to FCCC.  Peterson died before he was tried on the charges for which he was arrested.

Upon intake to FCCC, Peterson underwent standard medical screening.  Nurses took Peterson's vital signs and interviewed him about his medical history.  Peterson indicated that he had mental health problems but did not inform the nurses that he was taking any medications or that he suffered from any medical issues or injuries.

Unbeknownst to Defendants, Peterson suffered from congestive heart failure.  He also had been diagnosed with bipolar and schizoaffective disorders.  Peterson had been taking medication for both his heart and mental health issues before he was arrested.

According to Defendants, a form was prepared that would allow FCCC to obtain Peterson's medical records from third-party providers; however, Peterson did not sign the form or consent to a physical.   An FCSO deputy therefore signed an order stating that Peterson had refused medical assistance.  Plaintiffs note that, in signing off on the order, that deputy violated FCSO policy because only medical personnel are permitted to sign such forms.

The nurses conducting the intake process noticed that Peterson was answering questions inappropriately.  They therefore initiated medical observation.  Peterson was placed under "watch" from August 5, 2011 to August 8, 2011, during which time nurses checked on him every ten minutes (according to FCCC documentation).

Defendant Douglas Hahn was FCSO's mental health liaison during this time.  He observed Peterson during the intake process and during the three-day medical watch.  Peterson informed Hahn during that time that he had been taking medication for high blood pressure, which Hahn informed the nursing staff.  According to Hahn, he believed Peterson was suffering from alcohol withdrawal.

On August 8, 2014, Peterson was transferred to an isolation cell.  The parties agree that isolation cells are used—and sometimes necessary—for inmates who pose a threat to themselves or other inmates.  Peterson remained in his isolation cell until his death on September 4, 2011 (for a total of approximately twenty-eight days).

Pursuant to FCCC policy, nursing staff visit inmates in isolation cells approximately three times per week.  Plaintiffs do not dispute the fact that nurses performed those rounds in this case.  FCCC nurses did not note any specific medical findings or indicate that Peterson made any medical complaints during any such rounds.  Plaintiffs did not name any of the FCCC nurses as defendants in this action.

Three psychiatrists also visited Peterson during the twenty-eight days he was in the isolation unit.  One of those psychiatrists, Dr. John Tilley, visited Peterson on September 1, 2011 pursuant to a court order from the Franklin County Municipal Court ("County Court").  Tilley informed the County Court that Peterson "had been acutely psychotic and refusing medications since his admission."  (ECF No. 224-4, at PAGEID # 8769).  Tilley also stated that Peterson

"presented with various indications of psychosis," that "[h]e was impossible to engage in meaningful, sustained, logical conversation," and that "[h]is thought processes were grossly disorganized and his thought content appeared saturated by delusional content." (*Id*.)  Each of the three psychiatrists prescribed the medication Risperdal, which nurses provided Peterson daily.  None of the psychiatrists are named as defendants in this action.

Defendant Hahn accompanied the psychiatrists to each of their visits.  In addition, Defendant Hahn also performed rounds in the isolation unit during this time.  According to Defendants' records, Hahn observed Peterson thirteen times between August 8, 2011 and September 2, 2011.  Hahn indicated that he visually checked on and interacted with Peterson during those visits.  Hahn did not report any complaints from Peterson other than a request for a B-12 shot on August 8, 2014.  In connection with Defendants' motion for summary judgment, Hahn issued a sworn declaration that he did not consider Peterson to be in need of medical attention for any physical problem at any time before September 2, 2011.

Notwithstanding Hahn's observations, Plaintiffs offered evidence that Peterson showed signs of needing medical attention throughout his incarceration.  Plaintiffs offered, for example, an affidavit from neighboring inmate Etonate Butler stating that Peterson frequently asked for a nurse because he was not feeling well.  (ECF No. 219-4, at PAGEID # 7583.)  Plaintiffs also offered expert testimony stating that Peterson's heart condition caused him to gain "30 plus pounds of 'edema' fluid weight while he was in jail and prior to his death."  (ECF No. 218-1, at PAGEID # 6711.)  The same expert opined that Peterson's condition would have caused swelling of the extremities (often legs and feet) that would make walking and caring for oneself difficult.  (*Id*. at PAGEID # 6712.)  Inmate Butler echoed that observation and stated that, at the

time of his death, Peterson's "feet had swelled up huge to where he couldn't even stand on them." (ECF No. 219-4, at PAGEID # 7683.)

Additional evidence supports Plaintiffs' position that Peterson became either unable or unwilling to care for himself during his incarceration. The parties dispute the condition of Peterson's cell in the weeks leading up to his death; however, it appears to be undisputed that Peterson dirtied his cell on more than one occasion. Plaintiffs offered evidence that Peterson spread trash around his cell and defecated in it. He also ripped his mattress and attempted to wear the stuffing as a coat. And although Defendants offered evidence that FCSO personnel cleaned Peterson's cell at least once after he dirtied it, Plaintiffs offered evidence that at least some FCSO personnel acknowledged that Peterson's cell needed to be cleaned but that they did not clean it.

Plaintiffs offered evidence of additional disturbing behavior that Peterson exhibited throughout his incarceration. In an email dated August 17, 2011, for example, an individual associated with the County Court characterized Peterson as "fairly psychotic" and listed several "nonsensical" statements that Peterson made during a visit. (ECF No. 224-4, at PAGEID # 8771.) According to an investigator tasked with conducting an internal investigation of the incident, Peterson at times barked like a dog and refused recreation and showers.

Plaintiffs assert that Peterson's symptoms worsened in the days and hours leading up to his death. Defendant Hahn testified that, during a visit with Peterson on September 2, 2011, he became concerned that Peterson "was not feeling well" and requested that one of the nurses check on him. (ECF No. 208-6, at PAGEID # 5811.)

It is undisputed that, at some point during the morning of September 4, 2011, edema fluid overwhelmed Peterson's body. Inmate Butler testified that Peterson began gasping for air and

moaning around 2:30 or 3:30 a.m.  Another inmate stated (according to the internal investigation report) that Peterson sounded like he was gasping for air.

Defendant Nibert, a floor deputy responsible for conducting rounds on the morning of Peterson's death, testified that he served Peterson breakfast at approximately 5:10 a.m. on the date of his death.  Defendant Nibert testified that he had a "brief verbal exchange" with Peterson at that time.  (ECF No. 208-47, at PAGEID#  5956.)  Defendant Nibert also testified that he "detected no unusual odor" and "saw no feces or food waste" in Peterson's cell.  (*Id*. at PAGEID # 5957.)  Finally, Nibert testified that Peterson "in no way[] seemed to require medical attention when I provided him breakfast on the morning of September 4, 2011."  (*Id*. at PAGEID # 5956.)

Defendant Hoar, another floor deputy tasked with conducting head counts on the morning of Peterson's death, was supposed to—but did not—conduct an inmate head count at the beginning of his shift at 7 a.m.  Defendant Hoar testified that he began a head count around 7:30 a.m., at which time he observed Peterson asleep leaning against the wall.  He did not observe Peterson's cell to be dirty at that time.

It is undisputed that Peterson died before 9:00 a.m. on September 4, 2011.  The coroner found that Peterson's heart disease caused sudden cardiac death.  According to Plaintiffs' experts, Peterson essentially drowned in his own fluids.

FCSO personnel discovered Peterson's lifeless body during a medication pass at approximately 9:00 a.m.  At that time, several Defendants attempted to perform lifesaving measures.  Plaintiffs point out several errors that took place during those efforts: about a minute passed before anyone touched the body and then another minute before anyone started CPR, the deputy who initiated CPR did so incorrectly, and the deputy who called in the medical emergency incorrectly reported Peterson's condition as "ill" instead of "unresponsive."

Plaintiffs do not, however, assert that any of those errors caused or contributed to Peterson's death.

It is undisputed that, at the time Peterson's body was discovered, his cell was covered in trash and feces. Plaintiffs offered evidence that the Columbus Fire Department ("CFD") (who responded to the medical emergency) was disgusted by the condition of Peterson's cell and even complained to Defendant Scott about the same. Several defendants testified that, had they seen Peterson's cell in the condition it was in on the date of his death, they would have taken immediate action to clean it.

Shortly after Peterson's death, the FCSO initiated an internal investigation of the facts surrounding the incident. A member of the FCSO conducted the investigation and wrote a report documenting his findings ("IAB Report"). The parties highlight different portions of the IAB Report in their briefs. For their part, Defendants point out that the IAB Report does not state that Peterson made any medical complaints to any defendant in this case. Plaintiffs, on the other hand, point out that the IAB Report recommended discipline for more than forty deputies. The IAB Report notes that discipline of deputies and their supervisors was appropriate for the following reasons: (1) certain deputies did not enter the common areas of single cells during rounds to physically observe inmates, (2) multiple deputies failed to conduct required rounds and/or headcounts on the day Peterson died and some erroneously logged that they completed those rounds, (3) supervisors failed to enter the common areas of single cells to observe inmates and ensure that deputies were doing the same, (4) one or more deputies ignored the conditions in Peterson's cell, (5) deputies failed to log the instances in which they cleaned Peterson's cell, and (6) Peterson's mattress was taken away (an event that was not logged) at some point during his incarceration and was not replaced.

Plaintiffs appear to have brought this action against every individual named in the IAB Report.  In addition to Hahn, Plaintiffs named as defendants thirty-two floor deputies ("Deputies), nineteen supervisors ("Supervisors"), Major Douglas Edgington (the facility commander at FCCC during Peterson's incarceration), and Sheriff Zach Scott (the highest ranking officer at FCSO).  The Deputies (consisting of Defendants Fetch, Neely, Ward, Baljak, Benson, Conley, Jones, Moore, Heaberlin, Wood, Hicks, Hulet, Nibert, Dennis, Holt, Neal, Chesser, Spang, Bishop, Hoar, Longstretch, Kantor, Haley, Randall, White, Blust, Meade, Rakich, Tingley, Casper, Upton, and McKinney) had varying levels of interaction with Peterson. Some of those Deputies, such as Defendants Baljak and Conley, are only named as defendants because they allegedly knew of the conditions in Peterson's cell but failed to clean it.

The Supervisors (consisting of Defendants Turner, Leonard, Dean, Bachelder, Rettig, Cox, Minerd, Boubary, Byrd, Kolesar, Montrose, Johnson, McDownell, Thompson, Montgomery, Little, Martin, Hawse, and Dennis) were responsible for ensuring that the Deputies properly performed their duties.   Most of the Supervisors are named as defendants in this action because they allegedly failed to clean Peterson's cell, failed to supervise their subordinates, and failed to enter the common area of single cells to observe subordinates' work.  Plaintiffs similarly alleged that Defendant Edgington is liable in this case because he failed to clean Peterson's cell, failed to adequately supervise subordinates, and failed to enter the common areas of single cells to observe his subordinates' work.

Defendant Scott is the final defendant in this action.  Plaintiffs assert that Defendant Scott is responsible for overseeing FCCC and the FCSO employees who work there.  Defendant Scott's responsibilities also include policymaking and discipline.

In addition to bringing individual-capacity suits against each Defendant, Plaintiffs also brought their claims against each Defendant in his or her official capacity.  As explained below, that claim is equivalent to alleging municipal liability against Franklin County.

Plaintiffs' Amended Complaint asserts four claims for relief against all Defendants: a federal claim for relief under 42 U.S.C. § 1983 for cruel and unusual punishment in violation of the Eighth Amendment, and state law claims for negligent provision of medical care, wrongful death, and loss of consortium.  Regarding the Eighth Amendment claim specifically, Plaintiffs allege that Peterson had a serious medical condition of which each Defendant knew or should have known.  Plaintiffs further allege that each Defendant violated Peterson's constitutional right to adequate medical care so as to unnecessarily cause Peterson pain.  Plaintiffs add that Defendants failed to clean Peterson's cell after observing its unsanitary conditions and that Defendants failed to properly conduct rounds and attend to Peterson's condition on the morning of his death.

Defendants moved for summary judgment on each of Plaintiffs' claims.  That motion is now ripe for adjudication.

## II.    DISCUSSION

### A.    Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.

*See Muncie Power Prods., Inc. v. United Tech. Auto., Inc*., 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B.  Plaintiffs' Motion to Strike (ECF No. 238)

As a preliminary matter, Plaintiffs moved to strike portions of Defendants' reply memorandum in which Defendants objected to certain evidence Plaintiffs raised in their memorandum in opposition to the summary judgment motion.  Specifically, Defendants objected to Plaintiffs' reliance on portions of the IAB Report and the declaration from inmate Butler. Defendants argued that Butler's declaration and portions of the IAB Report are not proper evidence under Federal Rule of Civil Procedure 56(c) and made several arguments as to why that evidence does not create a genuine issue of material fact in this case.

Plaintiffs moved to strike Defendants' evidentiary arguments.  Instead of citing any authority in which courts struck similar arguments in like circumstances, Plaintiffs argued that they have been raising the IAB Report and Inmate Butler's observations throughout this

litigation such that they were "sandbagged" by Defendants' arguments.  (ECF No. 238, at 3.)

Plaintiffs also argue that the Court should strike Defendants' arguments because they are vague.

Plaintiffs' motion is not well taken.  In their reply memorandum, Defendants properly responded to issues and evidence Plaintiffs raised in their memorandum in opposition to Defendants' motion.  Defendants did not, as Plaintiffs assert, raise new evidence or issues outside the scope of the briefs.  Moreover, Plaintiffs' argument that Defendants should have anticipated the evidence on which Plaintiffs would rely and objected to that evidence in their motion is particularly unavailing given that Plaintiffs could have anticipated Defendants' objections and addressed them in their memorandum in opposition to Defendants' motion.  In short, Plaintiffs provide no persuasive grounds on which the Court should strike Defendants' arguments.

In the alternative to their motion to strike, Plaintiffs seek leave to file a sur-reply to address Defendants' evidentiary objections.  Pursuant to Southern District of Ohio Civil Rule 7.2(a)(1), parties may file a motion and memorandum in support, a memorandum in opposition, and a reply memorandum.  "No additional memorandum beyond those enumerated will be permitted except upon leave of court for good cause shown."  S.D. Ohio Civ. R. 7.2(a)(2).  Plaintiffs assert that good cause exists to file a sur-reply in this case "to ensure Plaintiffs [sic] arguments regarding evidentiary matters are preserved for appellate purposes, if necessary." (ECF No. 238, at 5.)

The Court declines to grant Plaintiffs' request to file a sur-reply in this case.  Plaintiffs do not raise any good cause for their request other than a desire to respond to Defendants' arguments in their reply memorandum, which would exist in every case.  In this case specifically, the Court is well-equipped to address Defendants' arguments that neither the Butler

declaration nor the IAB Report create a question of fact without additional briefing.  The Court

therefore **DENIES** Plaintiffs' motion.  (ECF No. 238.)

With that preliminary issue resolved, the Court turns to the merits of Plaintiffs' claims.

### B.    Eighth Amendment § 1983 Claim

Because Plaintiff's Eighth Amendment § 1983 Claim is the basis for this Court's subject

matter jurisdiction, the Court begins its analysis with that claim.  Section 1983 provides, in

relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  There is no dispute that all Defendants acted under color of state law at all

times relevant.  Accordingly, to succeed on their §1983 claim, Plaintiffs must establish the

following elements: deprivation of a constitutional right, a sufficient causal connection between

each Defendant and the deprivation, and that each Defendant acted with a sufficiently culpable

state of mind.  *See, e.g., Lillard v. Shelby Cty Bd. of Educ.*, 76 F.3d 716, 724 (6th Cir. 1996)

(stating that the threshold inquiry for analyzing a § 1983 claim is " 'whether the plaintiff has

been deprived of a right secured by the Constitution and laws' " (citing *Banker v. McCollan*, 443

U.S. 137, 140 (1979))); *Lynn v. City of Detroit*, 98 F. App'x 381, 387 (6th Cir. 2004) (discussing

causation); *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (explaining the state of mind

requirement).

Plaintiffs invoke the Eighth Amendment to the United States Constitution as the basis of

their claim.  Claims under the Eighth Amendment, which prohibits cruel and unusual

punishment, generally take one of two forms in the prison context: those involving excessive

force, and those involving an inmate's "conditions of confinement." *Thaddeus-X v. Blatter*, 175 F.3 378, at 400–01 (6th Cir. 1999) (citing numerous cases). Plaintiffs bring the latter type of claim and challenge Peterson's conditions of confinement.

"Although the Eighth Amendment does not apply to pretrial detainees [such as Peterson], these detainees have a right under the Fourteenth Amendment's Due Process Clause analogous to a prisoners [sic] Eighth Amendment right to be free from cruel and unusual punishment." *Koch v. Cty. of Franklin, Ohio*, No. 2:08-cv-1127, 2010 WL 2386352, at *12 (S.D. Ohio June 10, 2010). "Thus, suits filed by pretrial detainees challenging conditions of confinement are analyzed under the same framework as claims filed under the Eighth Amendment." *Id*. The Court therefore looks to Eighth Amendment jurisprudence in order to determine whether Peterson suffered a constitutional deprivation in this case.

The Eighth Amendment imposes certain duties on prison officials. Specifically, prison officials have a duty to provide "humane" conditions of confinement by ensuring that inmates receive "adequate food, clothing, shelter, and medical care." *Farmer*, 511 U.S. at 832. Because the Eighth Amendment prohibits cruel and unusual *punishment*, however, every violation of that duty does not amount to a constitutional deprivation. Only those deprivations that satisfy both an objective and subjective component violate the Eighth Amendment. *See id*. at 834.

To satisfy the objective component, a plaintiff must demonstrate that the alleged deprivation is "sufficiently serious" and that the prison official's act or omission resulted "in the denial of the minimal civilized measure of life's necessities." *Id*. (internal citations omitted). If the deprivation is based on an omission, or failure to prevent harm, the plaintiff also must demonstrate that the inmate or detainee was "incarcerated under conditions posing a substantial risk of serious harm." *Id*. (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

13

To satisfy the subjective component, a plaintiff must demonstrate that each defendant acted with deliberate indifference to the inmate or detainee's health or safety.  *Id.* at 835.  That standard "entails something more than mere negligence," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Id.*  A prison official cannot be found liable under the Eighth Amendment unless he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

Noticeably absent from the above analysis is any discussion of discretionary versus ministerial duties.  Plaintiffs argue that certain Defendants were performing ministerial duties such that an exception to qualified immunity applies; however, an exception to a defense such as qualified immunity does not establish an underlying Eighth Amendment violation.  Plaintiffs' suggestion in their briefs that certain Defendants' failure to perform ministerial duties establishes a § 1983 claim is an incorrect statement of law.

The Court will analyze Plaintiffs' Eighth Amendment § 1983 claim with respect to each group of Defendants (Deputies, Supervisors, Defendant Edgington, Defendant Hahn, Defendant Scott, and FCSO).  For the Deputies and Supervisors, "[t]he subjective component of a deliberate indifference claim must be addressed for each officer individually."  *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008) (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (brackets omitted).  General accusations against categories of defendants only suffice if circumstances exist from which a trier of fact could infer that each individual officer knew of a serious risk to the inmate's health or safety such that the officer's failure to alleviate that risk amounted to deliberate indifference.  *Compare id.* at 542 n.1

(inferring individual knowledge from general accusations against a group of corrections officers when the jail was of "modest size" (with eighteen jailors and one jail captain) and the inmate exhibited "obvious symptoms" of a specific medical need for a specified time period) *with Jones v. Muskegon Cty.*, 625 F.3d 935, 938, 942–43 (6th Cir. 2010) (finding that general accusations against a group of "guards" who interacted with an inmate over a period of time did not create an issue of fact regarding the liability of any specific officer). *See also Smith v. Cty. of Lenawee*, 505 F. App'x 526, 532–537 (6th Cir. 2012) (examining a timeline of the circumstances leading up to an inmate's death and analyzing the role each individual defendant played in the inmate's care during that time); *accord Jimenez v. Hopkins Cty., Ky.*, No. 4:11-CV-00033, 2014 WL 176578, at **12–15 (W.D. Ky. Jan. 13, 2014) (same).

### 1. *Deputies*

Plaintiffs assert that thirty-two Deputies violated Peterson's Eighth Amendment rights in several ways: by forcing him to sleep in a cell with no mattress, by failing to clean his cell, by failing to respond to his medical needs, by failing to properly conduct rounds, and by failing to log certain events. The Court first addresses Plaintiffs' allegations regarding the lack of a mattress.

It is important to note that this is not a case in which FCCC personnel placed an inmate in a cell with no mattress. To the contrary, it is undisputed in this case that Peterson was provided at least one mattress, which he destroyed. Plaintiffs' claim is simply that the Deputies did not promptly replace Peterson's mattress after he destroyed it.

Setting aside Defendants' arguments that they did replace Peterson's mattress in a timely manner, Plaintiffs fail to demonstrate an Eighth Amendment violation against any Deputy with respect to Peterson's mattress. The Sixth Circuit has made clear that mattress deprivation for a

relatively short period of time is not "sufficiently serious" enough to satisfy the objective prong of an Eighth Amendment claim. *See, e.g., Richmond v. Settles*, 450 F. App'x 448, 455 (6th Cir. 2011). That is especially true when the inmate played some role in causing his mattress to get taken away. *Cf. Banks v. Mozingo*, 423 F. App'x 123, 127 (3d Cir. 2011) (declining to find an Eighth Amendment violation when the prisoner created the conditions of which he complained).

Plaintiffs argue that Peterson's claim should be interpreted under the less stringent standards of the Fourteenth Amendment rather than the Eighth Amendment; however, the law in this circuit is clear that "suits filed by pretrial detainees challenging conditions of confinement are analyzed under the same framework as claims filed under the Eighth Amendment." *Koch*, 2010 WL 2386352, at *12. Plaintiffs' cited authority, in which prison officials placed a pretrial detainee in a room with no mattress, is distinguishable and does not support their argument. *See Brown v. City of Detroit*, Case No. 10-12162, 2013 WL 718490, at *3 (E.D. Mich. Feb. 27, 2013) (stating that arrestees generally must be given a mattress if they are held overnight; the court did not discuss a scenario in which an arrestee destroyed his or her own mattress).

To the extent Plaintiffs' mattress allegations can be interpreted as a claim for failure to prevent harm (in that the Deputies failed to prevent Peterson from destroying his own mattress), they can be analyzed alongside Plaintiffs' allegations regarding the Deputies' other alleged failures. Specifically, Plaintiffs assert that the Deputies violated Peterson's Eighth Amendment rights by failing to clean his cell after he dirtied it, by failing to properly conduct rounds, by failing to log certain events, and by failing to provide medical attention. Because these allegations involve omissions and not affirmative conduct, Plaintiffs must demonstrate that Peterson was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*,

511 U.S. at 834.[2]  The Court must first define the risk of harm in order to determine which Deputies (if any) knew of and consciously disregarded that risk.

Although Plaintiffs attempt to split their allegations into two different claims—for deliberate indifference to Peterson's "conditions of confinement" and for deliberate indifference to his medical needs—they identify the same risk of harm for both claims.  In the latter claim, Plaintiffs assert that Peterson's heart condition, when left untreated, posed a substantial risk of serious harm.  *See* ECF No. 223, at 40–42.  Plaintiffs assert that such a risk was sufficiently serious to satisfy the objective prong of this Eighth Amendment analysis.

In their "conditions of confinement claim," Plaintiffs detail the filthy state of Peterson's cell, the improper headcounts, and the fact that certain events (such as the time Peterson tore up his mattress) were not logged.  Yet Plaintiffs do not identify any risk of harm posed by these conditions other than the risks posed by Peterson's medical condition.  *See* ECF No. 223, at 32–33 (arguing that congestive heart failure and Peterson's mental health issues are "serious medical condition[s]" such that the objective component is satisfied).  As such, although the Deputies' failure to conduct proper headcounts, log certain events, and clean Peterson's cell may be cause for concern, they cannot form the basis of a § 1983 claim independent of Peterson's claim for deliberate indifference to his medical needs.  *See Farmer*, 511 U.S. at 834; *cf. Jones v. Smith*, No. 1:10-CV-568, 2014 WL 1463872, at *5 (W.D. Mich. Apr. 15, 2014) (analyzing a claim that

---

[2] Plaintiffs' allegations regarding the cleanliness of Peterson's cell are different from many cases involving unsanitary living conditions.  Although the Sixth Circuit has held that placing a prisoner in a cell covered in feces as a form of punishment violates the objective prong of the Eighth Amendment, *see Taylor v. Larson*, 505 F. App'x 475, 477 (6th Cir. 2012), those facts differ from the facts alleged in this case in one important respect.  Here, Plaintiffs do not allege affirmative conduct on behalf on any Defendant with respect to the condition of Peterson's cell.  This case instead involves Defendants' alleged failure to clean Peterson's cell after he dirtied it.  Because this case involves an alleged failure to prevent harm, Plaintiffs must identify and prove that Peterson faced a substantial risk of serious harm.  *See Farmer*, 511 U.S. at 834; *accord Banks*, 423 F. App'x at 127 (finding, in a case in which a prisoner spread feces around his own cell, that the prisoner "introduced no evidence to establish that these conditions posed a substantial risk of serious harm") (internal quotations omitted).  That added element distinguishes this case from cases like *Taylor*.

a prison official failed to make his rounds by analyzing whether the official subjectively knew that the inmate required medical attention).  The Court therefore analyzes Plaintiffs' "conditions of confinement" and "medical needs" claims together.

The identified risk of harm (Peterson's untreated medical condition) caused Peterson's death.  That risk undoubtedly was sufficiently serious to meet the objective prong of this Eighth Amendment analysis.  The question becomes whether Plaintiffs can prove the subjective element against each individual Deputy—i.e., that each individual Deputy was aware of facts from which the inference could be drawn that Peterson was at risk of serious harm if he did not receive medical care, and that each Deputy also drew the inference.  *See, e.g., Jimenez*, 2014 WL 176578, at 12 (stating that the question is not whether prison officials knew of the inmate's exact medical condition; the question is whether they knew he was at risk of harm if he did not receive medical attention).

The Court concludes that those Deputies who did not have contact with Peterson on the morning of his death are entitled to summary judgment on Plaintiffs' Eighth Amendment § 1983 claim.  The evidence suggests that no one at FCCC or FCSO knew that Peterson had been diagnosed with congestive heart failure or that he had been taking medication to treat the same. Defendants also offered evidence that Peterson never formally requested medical attention. Relatedly, Defendants offered affidavits from the individual Deputies stating that they did not consider Peterson to be in need of medical assistance at any point.  That evidence is sufficient to shift the burden to Plaintiffs to identify specific facts from which a reasonable jury could conclude that each Deputy subjectively perceived (and ignored) the risk of harm to Peterson.

Plaintiffs argue that Peterson's need for medical attention would have been obvious to each individual Deputy assigned to interact with Peterson at some point during his incarceration.

Plaintiffs state that Peterson was at risk of harm because his "physical decomposition was readily apparent and obvious to even a lay person, even days after his incarceration."  (ECF No. 33, at 39.)  Plaintiffs identify the following facts from which prison officials should have inferred that Peterson was at risk for serious harm if he did not receive medical attention: he was rapidly gaining weight, the condition of cell was in constant filth, and the Deputies knew (from his behavior) that he had mental health issues.[3]

Plaintiffs also cite the testimony of inmate Butler, who noted that "[e]veryday [Peterson would] ask the dep's to get the nurse he wasn't feeling good + dey refused" and that "Deputy's & nurses refused him treatment countless tymes."  (ECF No. 219-4, at 4.)  Butler also noted that, during Peterson's twenty-eight day incarceration, his (Peterson's) feet became swollen, he had trouble walking, and he eventually became unable to walk, stand, or move.  *See id*.

As further support for their claim, Plaintiffs cite testimony from their expert, Lester Suna, stating that Peterson "put on 30 plus pounds of 'edema' fluid weight while he was in jail and prior to his death" and that "[a] review of the medical records shows that as Mr. Peterson slowly accumulated massive amounts of edema fluid, his feet swelled and became severely blistered."  (ECF No. 218-1, at 1–3.)  Plaintiffs also note that Defendant Hahn acknowledged that "[i]t didn't look like [Peterson] was feeling well" a few days before his death and that "[i]t looked like a physical issue."  (ECF No. 218-4, at 39.)

Plaintiffs' argument that the risk of harm was obvious to each individual Deputy fails for one simple reason: there is no evidence that each individual Deputy had knowledge of the facts to which Plaintiffs point.  It is undisputed that some of the Deputies only had contact with Peterson once or twice during his twenty-eight-day incarceration.  Those Deputies therefore

---

[3] Plaintiffs also assert that the Deputies "knew [Peterson] was on medication," (ECF No. 223, at 33), but do not cite to the record or provide any evidence in support of this assertion.

would not have been aware of any differences in Peterson's weight, differences in his behavior, or of the "constant" state of Peterson's cell.  It similarly is undisputed that certain Deputies took action to clean Peterson's cell after he dirtied it, yet Plaintiffs make no attempt to distinguish those Deputies (or the ones on duty immediately after the cleaning who, presumably, would have witnessed Peterson with a clean cell) from the others that had contact with Peterson.

Moreover, even if certain Deputies knew that Peterson dirtied his cell, and even if they concluded from that behavior that Peterson suffered from mental health issues, that knowledge does not create a question of fact about whether those Deputies knew Peterson was at risk of serious harm.  It is undisputed that three different psychiatrists, in addition to FCCC's mental health liaison, visited Peterson during his twenty-eight-day incarceration.  Even if Peterson faced a specific risk of harm by not receiving additional mental health treatment, there is no evidence that the Deputies were responsible for recommending mental health treatment in addition to that provided by mental health professionals.  The Deputies therefore cannot be responsible for *causing* a constitutional deprivation in this regard.  *See, e.g., Lynn*, 98 F. App'x at 387 (finding no causal connection sufficient to establish a § 1983 claim for failure to investigate and report criminal activity when it was not the defendants' job to investigate or report such activity).

Plaintiffs rely on a statement from one Deputy that he refused to clean Peterson's cell because he knew Peterson was mentally ill, but fail to tie that knowledge (of mental illness) to the identified risk of serious harm (the physical risks caused by Plaintiffs' untreated medical condition).  The same can be said of any argument that the Deputies should have recognized Peterson's mental health issues from the state of his cell: even if those Deputies were aware that Peterson was mentally ill, the Court cannot conclude from that fact that those Deputies were aware that Peterson faced a serious risk of harm if he did not receive medical care for a physical

condition.  Put simply, although Plaintiffs rely heavily on the Deputies' failure to clean Peterson's cell, they fail to tie that conduct to any identified risk of serious harm.[4]

The statements from Dr. Suna and Defendant Hahn similarly fail to impute knowledge of the risk of harm to each individual Deputy.  It is undisputed that, upon first being admitted to FCCC, Peterson was able to move, go outside for recreation, and tear up his mattress, among other things.  He was not physically incapacitated from day one.  Dr. Suna's testimony that Peterson "slowly" began to accumulate fluid such that his movement became restricted does not suggest that his medical condition would have been obvious to each individual Deputy charged with conducting rounds and headcounts.  Defendant Hahn's testimony is similarly vague as to whether any individual Deputy would have perceived that Peterson faced a serious risk of harm if he did not receive medical care.

Plaintiffs therefore are left with Butler's testimony.  As stated above, Butler (a neighboring inmate in a separate isolation cell) noted that Peterson asked the Deputies for a nurse "everyday" and that the Deputies constantly refused him medical treatment.  The question is whether this testimony could support a finding that each Deputy who came into contact with Peterson before the date of his death subjectively perceived the risk of harm to Peterson.

The Court agrees with Defendants that Butler's testimony is not specific enough to create a question of fact with respect to each of the thirty-two individual Deputies.  *See, e.g., Jones v. Muskegon Cty.*, 625 F.3d 935, 942 (6th Cir. 2010) (holding that affidavits stating that neighboring inmates witnessed the decedent's deteriorating condition did not create a question of fact with respect to whether each corrections officer knew of the risk of harm to the decedent because the affidavits "refer to 'guards' in a general sense . . . without specifying wrongdoing

---

[4] Plaintiffs state elsewhere in their briefs that the condition of Peterson's cell caused stress that would have exacerbated his heart condition; however, without proving that the individual Deputies knew of Peterson's heart condition, Plaintiffs cannot demonstrate that any Deputy knew of that risk.

attributable to any particular defendant"). Even accepting Butler's testimony that Peterson complained of pain "every day" (which itself contradicts the evidence that Peterson was fully mobile at the beginning of his confinement), more than one Deputy performed rounds of the isolation unit per day. Plaintiffs make no effort to identify the specific Deputies that would have heard Peterson's complaints. Moreover, Butler's statement that Peterson said he "wasn't feeling good" is vague and does not necessarily establish the existence of a serious medical condition. Given that "[t]he subjective component of a deliberate indifference claim must be addressed for each officer individually," *Phillips*, 534 F.3d at 542, Plaintiffs fail to meet their burden of identifying evidence that could support a finding that each individual Deputy who interacted with Peterson before the day he died would have perceived the risk of serious harm.

The Court reaches opposite conclusion with respect to the two Deputies (Defendants Nibert and Hoar) who interacted with Peterson on the morning of his death. Regarding the day Peterson died, Butler noted that Peterson had been "makin' moaning noises all night since a lil before 3rd shift and everybody kept askin' him is he okay an he kept sayin' NO!." (ECF No. 219-4, at PAGEID # 7582.) Dr. Luna also stated that, by the time of his death, Peterson had suffered fluid buildup (which would have caused his feet to swell and become severely blistered) and that it would have been difficult for him to breathe as the fluid overwhelmed his heart and lungs. (ECF No. 218-1, at PAGEID # 6712–13.)

Deputy Nibert testified that he served Peterson breakfast at approximately 5:10 a.m. on the date of his death and that he had a brief verbal exchange with Peterson at that time. Deputy Hoar testified that he observed Peterson around 7:30 a.m. on that date and that Peterson was asleep leaning against a wall. It is undisputed that neither Deputy Nibert nor Hoar contacted

medical personnel or took any action to aid Peterson at that time.  It similarly is undisputed that Peterson died before 9:00 a.m. on that date.

Although Deputies Nibert and Hoar testified that they did not perceive a risk of harm to Peterson at the time they observed or interacted with him on the morning of September 4, 2011, there exists a question of fact as to whether the risk of harm was obvious at that point.  Viewing the facts in the light most favorable to Plaintiffs, including Butler's observations and Plaintiffs' experts' testimony, a reasonable jury could conclude that Peterson was in obvious distress (i.e., having difficulty breathing and/or moaning in pain) at 5:10 and 7:30 a.m. on the date of his death.  As such, there exists a question of fact as to whether Deputies Nibert and/or Hoar subjectively perceived the risk of harm to Peterson and disregarded that risk by failing to summon medical personnel or otherwise take action.  *See, e.g., Smith v. Cty. of Lenawee*, 505 F. App'x 526, 535 (6th Cir. 2012) (denying qualified immunity for the corrections officer who interacted with the inmate on the date of her death because the officer "encountered [the inmate] in her last hour, at a time when she was unresponsive and sweating profusely[; the officer] was on notice that [the inmate] was very ill and yet did nothing to make sure that [the inmate] had not taken a turn for the worse"); *Jimenez*, 2014 WL 176578, at *12 (finding that claims against four prison deputies survived summary judgment when the facts could suggest that the inmate was in need of medical care on the day he died and the deputies did not contact medical personnel or take action to aid the inmate).

Defendants' arguments to the contrary are not persuasive.  Defendants argue that Butler's testimony is hearsay; however, Butler's observations about Peterson's moaning on the morning of his death are not being used to prove the truth of any matter asserted and therefore are not hearsay under Federal Rule of Evidence 801.  Defendants' additional arguments about Butler's

testimony, such as the facts that there was no clock in the isolation unit and that Butler could not

see inside Peterson's cell, may be relevant to Butler's credibility but do not render his

observations inadmissible for purposes of this summary judgment analysis.

Defendants also argue that the Deputies relied on medical personnel to care for Peterson

and therefore could not have been deliberately indifferent to his care, but this argument similarly

fails. "Where officers are aware that an inmate is exhibiting severe symptoms, there exists a 'a

[sic] triable issue of fact about whether the guards should have contacted medical personnel in

response to this problem or at least should have tried to engage he inmate verbally or entered his

cell.' " *Jimenez*, 2014 WL 176578, at *13 (quoting *Finn v. Warren County, Ky*., 2012 WL

3066586, *10 (W.D.Ky. July 27, 2012)); *accord Smith*, 505 F. App'x at 535. Even if Deputies

Nibert and Hoar were not qualified to issue medical assistance to Peterson, if he was in obvious

distress in the hours leading up to his death, a reasonable jury could find that Deputies Nibert and

Hoar were deliberately indifferent to the fact that Peterson faced a serious risk of harm if he did

not receive immediate medical attention. As such, there exists a factual dispute as to whether

Deputies Nibert and Hoar violated Peterson's Eighth Amendment rights.

Defendants' argument that Deputies Nibert and Hoar are entitled to qualified immunity

fails for this same reason. Having found that there exists a question of fact as to whether these

Deputies were deliberately indifferent to a risk of serious harm, qualified immunity only applies

if the right was not clearly established such that a reasonable officer would not understand that

his conduct violates the right. *See, e.g., Smith*, 505 F. App'x at 531 (discussing the elements of

qualified immunity). Defendants argue that they are entitled to qualified immunity because

"there is no clearly established right requiring deputies in corrections to usurp or second guess

the medical staff with regard to medical judgments and treatment." (ECF No. 236, at 33.) But as

stated above, that argument does not extend to prison officials who witness an inmate in obvious distress and fail to take action or summon medical personnel.  *See Smith*, 505 F. App'x at 535 (denying qualified immunity for the corrections officer who interacted with the inmate on the date of her death).  Defendants Nibert and Hoar therefore are not entitled to qualified immunity.

As a final note, the Court briefly addresses Plaintiffs' allegations regarding the events that transpired after Peterson was discovered nonresponsive at 9:00 a.m. on the date of his death. Plaintiffs devote much of their Amended Complaint to discussing several Deputies' conduct at that time; however, it is undisputed that Peterson was dead at 9:00 a.m. such that nothing any Deputy did after that time could have caused Peterson's death.  Any such conduct therefore cannot form the basis of a § 1983 claim.  *See, e.g., Gardner v. Kenton Cty.*, No. 09-70, 2012 WL 6623097, at *8 (E.D. Ky. Dec. 19, 2012) (holding that a guard charged with acting deliberately indifferent after an inmate died could not be liable under § 1983 because no causal relationship existed between the guard's conduct and the inmate's death).

For those reasons, the Court concludes that all Deputies other than Deputies Nibert and Hoar are entitled to summary judgment on Plaintiffs' § 1983 Eighth Amendment claim.  The Court therefore **DENIES** Defendants' motion for summary judgment with respect to the § 1983 claim against Deputies Nibert and Hoar and **GRANTS** Defendants' motion for summary judgment with respect to § 1983 claim against the remaining Deputies.

### 2.  *Supervisors*

Plaintiffs named as Defendants nineteen Supervisors who oversaw the Deputies during the time Peterson was incarcerated.  Plaintiffs assert that each Supervisor is liable under § 1983 for violating Peterson's Eighth Amendment rights.

This Court previously stated the following with respect to supervisory liability in its April

16, 2014 Opinion and Order:

> It is well settled that liability under § 1983 cannot be premised on a theory of respondeat superior. *See, e.g., Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003). In other words, supervisors cannot be held liable under § 1983 for the acts of their agents.
>
> As such, when a plaintiff asserts a § 1983 claim against a supervisor premised on the acts or omissions of his or her subordinates, the plaintiff must allege and show an additional element: that the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* (citing *Hays v. Jefferson Cty.*, 668 F.2d 869, 872–74 (6th Cir. 1982)). The plaintiff must make this showing in addition to the three elements (violation, causation, and intent) set forth above.
>
> It is important that note that supervisors are never immune from liability simply because of their status as supervisors. If a supervisor violates an inmate's constitutional rights through the active performance of his or her duty, then liability is direct (not vicarious), and a § 1983 action may lie. *See, e.g., Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995) (finding that a supervisor could be liable for his conduct in approving inmate transfers without a reasonable policy in place to insure that the transferees were not placed in grave danger); *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992) (holding that a supervisor could be liable for, *inter alia*, referring inmate complaints to a nurse that he knew to be wrongly altering and destroying inmate prescriptions); *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) ("In both *Taylor* and *Hill*, it was the defendant supervisors' *active engagement* in a function of their position that directly resulted in injury to the plaintiffs." (emphasis added)); *see also Gregory*, 444 F.3d at 752.

(ECF No. 174, at 7–8 (footnote omitted).)

The Court agrees with Plaintiffs' characterization of the cited authority that each

Supervisor can be liable under § 1983 in one of two circumstances: (1) if he or she encouraged,

authorized, approved, or knowingly acquiesced in the unconstitutional conduct, or (2) if he or

she directly caused the violation through the active performance of his or her duty. The Court

disagrees, however, with Plaintiffs' contention that either of those circumstances is present in this case.

Plaintiffs argue that the Supervisors had an affirmative duty to perform rounds and personally check on the inmates in isolation such that each Supervisor is liable for his or her own failure to conduct headcounts, failure to perform rounds properly, failure to log important incidents, and failure to maintain Peterson's cell. But liability under § 1983 cannot attach simply because a Supervisor failed to adequately perform his or her job duties. Liability can only attach if each Supervisor's failure to perform his or her responsibilities *caused* a constitutional violation. *See, e.g., Essex*, 518 F. App'x at 355 (explaining that, for a supervisor to be directly liable for a § 1983 violation, the supervisor's active engagement in his or her job duties must directly result in injury to the plaintiff). The Court therefore must conduct the same analysis it applied to the Deputies to determine whether each Supervisor can be directly liable under § 1983 for violating Peterson's Eighth Amendment rights.

Because Plaintiffs' claim against the Supervisors is based on a failure to prevent harm, they must demonstrate that Peterson was incarcerated under conditions posing a substantial risk of serious harm and that each Supervisor knew of and consciously disregarded that risk. *See Farmer*, 511 U.S. at 834. Plaintiffs fail to make that showing with respect to any Supervisor. As with the Deputies, Plaintiffs fail to tie any Supervisor's failure to conduct proper rounds or clean Peterson's cell to a substantial risk of serious harm to Peterson's health or safety. As such, absent any evidence that each individual Supervisor knew of and consciously disregarded the risk Peterson faced in not receiving medical attention, the Supervisors cannot be directly liable for a constitutional violation.

The Supervisors similarly cannot be liable for encouraging, authorizing, approving, or knowingly acquiescing in unconstitutional conduct by their subordinates.  The Court has determined that only Deputies Nibert and Hoar can be liable under § 1983 for causing an Eighth Amendment violation, and that the basis of liability against those Deputies involves disputed questions of fact as to what transpired on the morning on September 4, 2011.  There is no evidence that any Supervisor was aware of Nibert or Hoar's conduct on September 4, 2011.  Plaintiffs similarly failed to point to any evidence that would have put any Supervisor on notice that either Nibert or Hoar was likely to deliberately ignore a serious risk to Peterson.  There simply is no basis on which to conclude that any Supervisor can be liable under § 1983 for violating Peterson's Eighth Amendment rights.

The Court therefore **GRANTS** Defendants' motion for summary judgment with respect to Plaintiffs' § 1983 claim against the Supervisors.

### 3. *Defendant Edgington*

Defendant Edgington, who was the facility commander at FCCC at all times relevant, filed his own motion for summary judgment and argues that he is entitled to qualified immunity because there is no evidence that he caused an Eighth Amendment violation.  Specifically, Defendant Edgington argues that Plaintiffs cannot establish the subjective component of their Eighth Amendment claim against him.

In response, Plaintiffs argues that "[i]ssues of fact exist regarding whether Mr. Edgington is liable for negligent performance of ministerial duties."  (ECF No. 216, at 1.)  As stated above, however, even if the Sixth Circuit recognized a ministerial exception to qualified immunity, that exception does not establish an Eighth Amendment violation.  Plaintiffs' argument therefore is

irrelevant to the question of whether Defendant Edgington acted with deliberate indifference to a sufficiently serious constitutional deprivation.

Plaintiffs then offer three arguments in support of their position that Defendant Edgington acted with deliberate indifference: that Defendant Egington "was ultimately responsible for cell cleanliness prior to Mr. Peterson's death," that Defendant Edgington "abandoned his duties as facility commander [relating to the cleanliness of Mr. Peterson's cell] by pawning them off to a secretary," and that "a widespread pattern of misconduct indicates that Mr. Edgington should have been aware of the situation if he actually performed his job."  (ECF No. 216, at PAGEID # 6036–38.)  None of these arguments comes close to suggesting that Defendant Edgington caused a constitutional violation such that he can be liable under § 1983.  Plaintiffs do not even attempt to offer evidence that Defendant Edgington knew of a substantial risk of harm to Peterson (indeed, they fail to tie the cleanliness issue to any risk of harm of which any Defendant was aware) and consciously disregarded that risk.  Nor do Plaintiffs attempt to offer evidence that Defendant Edgington encouraged, authorized, approved, or knowingly acquiesced in unconstitutional conduct by his subordinates.  The Court therefore **GRANTS** Defendant Edgington's motion with respect to the § 1983 claim against him.

### 4. Defendant Hahn

The § 1983 claim against Defendant Hahn turns on a different issue than the claims against the Deputies and the Supervisors.  Because Defendant Hahn visited Peterson two days before his death and acknowledged that Peterson did not look physically well, there is sufficient evidence from which a reasonable jury could infer that Defendant Hahn subjectively perceived a risk to Peterson's safety if he did not receive medical treatment.  The question is whether the evidence could support a finding that Defendant Hahn disregarded that risk.

The Court finds that Plaintiffs failed to establish a question of fact with respect to Defendant Hahn's § 1983 liability.  It is undisputed that, at the time Defendant Hahn observed Peterson not looking well, he was accompanied by both a doctor and a nurse.  Plaintiffs do not attempt to explain why Defendant Hahn (who is not a medical professional) had a duty to recommend medical care in addition to that which the treating doctor and/or nurse deemed appropriate.

Moreover, "[i]f a prison official knew of a risk to inmate health or safety, and reasonably responded to the risk, that official is free from liability, even if he failed ultimately to prevent harm."  *Bertl v. City of Westland*, Case No. 07-2547, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009) (citing *Farmer*, 511 U.S. at 844).  Defendant Hahn testified in his deposition that, after witnessing Peterson not looking well (during a visit with Peterson, a doctor, and a nurse), he (Defendant Hahn) "talked to the floor nurses and every nurse that was sitting in Booking or in the – at the nurse's desk, [and] asked them to check on Peterson."  (ECF No. 218-4, at PAGEID # 7092.)  Plaintiffs fail to identify any additional action that Defendant Hahn should have taken to address the risk of harm to Peterson.

Instead, in the two paragraphs of their brief that they devote to Defendant Hahn's liability, Plaintiffs assert that "[a] question of fact exists as to whether Mr. Hahn's failure to alert medical personnel and FCCCII deputies of Mr. Peterson's obvious medical needs amounted to deliberate indifference and/or recklessness."  (ECF No. 223, at 47.)  But as stated above, the evidence suggests that Defendant Hahn did alert medical personnel that Peterson might be in need of medical attention.  And any "obvious" medical needs he observed necessarily would have been observed by the medical personnel as well.  Plaintiffs fail to meet their burden of

pointing to specific evidence in the record that could create a question of fact as to Defendant Hahn's liability.

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment with respect to the § 1983 claim against Defendant Hahn.

### 5. *Defendant Scott and FCSO*

Plaintiffs assert that Defendant Scott is liable in his individual capacity under § 1983 for three reasons: he failed to discipline any of the Deputies for their role in Peterson's death, he failed to train the Deputies and Supervisors how to conduct proper rounds and headcounts, and he is liable for the constitutional violations of contracted-for medical personnel, who allegedly provided inadequate medical care (although they are not named as defendants in this action).

The Court agrees with Defendants that the claim against Defendant Scott for violations committed by third-party medical professionals is frivolous.  Plaintiffs state, without any legal or factual support, that medical personnel violated Peterson's constitutional rights because they failed to provide heart medication or a physical.  Plaintiffs elected not to sue those medical professionals.  Instead, Plaintiffs assert that "the misconduct of the FCSO's medical staff and contractors is an 'empty chair' issue for a jury to decide given the well-documented actions of the named Defendants."  (ECF No. 223, at 51–52.)  That argument fails to establish liability against the medical personnel who treated Peterson,[5] let alone against Defendant Scott.

The Court similarly agrees with Defendants that Defendant Scott is entitled to summary judgment on the § 1983 failure to train and failure to discipline claims.  To establish liability based on a failure to train claim (which typically are asserted against the municipality), a plaintiff must make the following showing:

---

[5] *See, e.g., Rouster v. Cty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014) (" '[C]ourts generally are reluctant to second guess the medical judgment of prison medical officials.' " (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 944 (6th Cir. 2010)).

> Ordinarily, it is necessary to show a pattern of similar constitutional violations by untrained employees in order to show that policymakers had notice of and deliberately [chose] a training program that will cause violations of constitutional rights. [*Connick*, 131 S. Ct. at 1359] (citing *Bd. of Cty. Commr's of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997)). Absent a pattern of violations, a plaintiff may assert a single incident theory of liability by alleging that the Constitutional deprivation at issue was the obvious consequence of the defendant's failure to provide specific training. *Id*. The latter theory is rare and exists in a narrow range of circumstances. *Id*.

*Miller v. De. Cty. Comm'rs*, No. 2:13-cv-501, 2014 WL 457552, at *8 (S.D. Ohio Feb. 4, 2014)

(internal quotations omitted).  Here, Plaintiffs assert that Defendant Scott was aware of a pattern

of constitutional violations in that at least nine deputies have been disciplined since 1997 for

failing to conduct proper headcounts and/or rounds and that, in 2007, a corrections officer did

not promptly begin life-saving measures on an inmate who hanged himself.  Plaintiffs conclude

that this pattern of violations shows that Defendant Scott consciously failed to train his

employees on how to conduct proper rounds and headcounts such that his conduct caused the

Eighth Amendment violation in this case.

Setting aside the issue of whether the cited violations establish a relevant pattern in this

case, Plaintiffs fail to demonstrate a causal connection between Defendant Scott's alleged failure

to train these Defendants and any Eighth Amendment violation.  The Court has already

concluded that the Deputies and Supervisors (other than Defendants Nibert and Hoar) are

entitled to summary judgment on Plaintiffs' Eighth Amendment § 1983 claims.  Defendant

Scott's alleged failure to train the Deputies and Supervisors other than Defendants Nibert and

Hoar therefore did not cause an Eighth Amendment violation.

Regarding Defendants Nibert and Hoar specifically, there exists no causal connection

between Defendant Scott's alleged failure to train employees how to conduct headcounts and

rounds and the issue of whether Defendants Nibert and Hoar deliberately ignored a serious risk

to Peterson's health.  There is no dispute that Defendants Nibert and Hoar observed or interacted with Peterson on the morning of his death; indeed, that fact is germane to the issue of whether they subjectively perceived a risk of serious harm to Peterson at that point.  *Cf. Jones v. Smith*, No. 1:10-CV-568, 2014 WL 1463873, at *5 (W.D. Mich. Apr. 15, 2014) (holding that a plaintiff failed to state a claim for deliberate indifference against a guard who failed to make his rounds because the guard could not have subjectively perceived the inmate's need for medical attention). Defendant Scott's alleged failure to train Nibert and Hoar to actually observe the inmates during security checks therefore did not cause the potential constitutional violation in this case.

The same is true regarding Defendant Scott's alleged failure to discipline his employees. Plaintiffs assert that Defendant Scott caused a constitutional violation because he did not follow an internal investigator's recommendation that several Deputies and Supervisors be disciplined for failing to properly perform rounds, failing to clean Peterson's cell, and failing to replace Peterson's mattress after he destroyed it.  Because the Court concluded that such conduct did not cause a constitutional violation, however, Defendant Scott's alleged failure to discipline that conduct does not amount to a constitutional violation.  Plaintiffs do not argue that Defendant Scott ratified, authorized, or otherwise approved any conduct on the part of Defendants Nibert or Hoar that could have violated Peterson's Eighth Amendment rights.  Plaintiffs' claims against Defendant Scott in his individual capacity therefore fail.

For those reasons, the Court **GRANTS** Defendants' motion for summary judgment regarding the § 1983 claim against Defendant Scott in his individual capacity.

Plaintiffs' claims against the officers in their official capacities are akin to asserting a claim against FCSO.  *See, e.g., Essex*, 518 F. App'x at 354.  That claim is premised on the same failure to train allegations that Plaintiffs asserted against Defendant Scott.  For the same reasons

as those set forth above, the Court finds that there exist no genuine issues of fact as to whether FCSO's failure to train its employees caused a constitutional violation in this case. Accordingly, the Court **GRANTS** Defendants' motion for summary judgment regarding the § 1983 claim against FCSO.

### C.  State Law Claims

Plaintiffs asserted the following state law claims against all Defendants: negligent provision of medical care, wrongful death, and loss of consortium. Defendants argued in their motions that the negligent provision of medical care claim is simply a medical malpractice claim, which cannot lie against these Defendants (none of whom are medical professionals). Defendants also argued that they cannot be liable for wrongful death because none of their actions proximately caused Peterson's death, and that Plaintiffs' claim for loss of consortium is derivative of the other state law claims and therefore must fail as well. Plaintiffs did not respond to any of these arguments.

Defendants offered the alternative argument that they are immune from liability for Plaintiffs' state law claims pursuant to Ohio Revised Code § 2744.03(A)(6). In response, Plaintiffs argued that Defendants acted "with malicious purpose, in bad faith, or in a wanton or reckless manner" to Peterson's medical needs such that the exception to immunity set forth in Ohio Revised Code § 2744.03(A)(6)(b) applies. Plaintiffs do not offer any arguments in support of their state law claims independent of their arguments in support of their Eighth Amendment § 1983 claims.

Having found that there exist no genuine issues of material fact as to whether all Defendants other than Nibert and Hoar acted with deliberate indifference to Peterson's serious medical needs, the Court likewise concludes there exist no genuine issues of material fact as to

whether all Defendants other than Nibert and Hoar acted "with malicious purpose, in bad faith, or in a wanton or reckless manner" to Peterson's medical needs.  As such, the Court agrees with Defendants that Ohio Revised Code § 2744.03(A)(6) immunizes all Defendants other than Nibert and Hoar from liability on Plaintiffs' state law claims.  The Court therefore **GRANTS** Defendants' motions for summary judgment on Plaintiffs' state law claims with respect to all Defendants other than Nibert and Hoar.

Having found, however, that there exists a question of fact as to whether Defendants Nibert and Hoar acted with deliberate indifference to Peterson's serious medical needs, the Court similarly finds that there exists a question of fact as to whether Nibert and Hoar acted "in a wanton or reckless manner" within the meaning of Ohio Revised Code § 2744.03(A)(6)(b).  *See, e.g., Stefan v. Olson*, 497 F. App'x 568, 580–81 (6th Cir. 2012) (finding a question of fact on the issue of state-law immunity when there existed a question of fact as to whether a corrections official acted deliberately indifferent to an inmate's needs).  The Court therefore cannot conclude as a matter of law that Defendants Nibert and Hoar are immune from liability on Plaintiffs' state-law claims.

The sole remaining issue is whether Plaintiffs' state law claims against Defendants Nibert and Hoar survive summary judgment.  With respect to the "negligent provision of medical care" claim, the Court agrees with Defendants that Ohio law does not recognize such a claim against non-medical personnel.  Plaintiffs fail to cite any case law in which an Ohio court recognized such a claim, let alone a claim against non-medical personnel.  And without a duty to provide medical care—which Plaintiffs make no attempt to argue existed in this case—the Court cannot conclude that such a claim lies against Defendants Nibert or Hoar.  The Court therefore

**GRANTS** all Defendants' motions for summary judgment on the negligent provision of medical care claim.

The Court reaches the opposite conclusion with respect to the wrongful death claim. Defendants argue that they did not have a duty to provide Peterson medical care such that their actions could not have caused Peterson's death; however, where a corrections official encounters an inmate facing an obvious risk of serious harm, courts have held that the official has a duty to summon medical personnel or otherwise take action. *See, e.g., Jimenez*, 2014 WL 176578, at *13; *accord Smith*, 505 F. App'x at 535. The Court has already determined that there exists a triable issue of fact as to whether Defendants Nibert or Hoar encountered Peterson in a state of obvious distress on the morning of his death. As such, Defendants' argument fails.

For those reasons, the Court **DENIES** Defendants' motion for summary judgment with respect to the wrongful death claim against Defendants Nibert and Hoar. Because Defendants do not argue that Plaintiffs' loss of consortium claim fails for any reason other than the fact that it is derivative, the Court likewise **DENIES** Defendants' motion for summary judgment with respect to the loss of consortium claim against Defendants Nibert and Hoar.

## III. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion to strike (ECF No. 238), **GRANTS** Defendant Edgington's motion for summary judgment (ECF No. 181), and **GRANTS IN PART** and **DENIES IN PART** the remaining Defendants' motion for summary judgment (ECF No. 208). Specifically with respect to the latter motion, the Court **GRANTS** the same with respect to all claims against all Defendants other than Nibert and Hoar, **GRANTS** Defendants Nibert and Hoar's motion for summary judgment on the negligent provision of medical care claim, and **DENIES** Defendants Nibert and Hoar's motion for summary judgment on the § 1983

Eighth Amendment claim, state-law wrongful death claim, and loss of consortium claim asserted against them in their individual capacities.

**IT IS SO ORDERED.**

<u>**/s/ Gregory L. Frost**</u>
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**