UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN C. RUIZ-BUENO, III, et al.,

                Plaintiffs,

v.

ZACK SCOTT, et al.,

                Defendants.

Case No. 2:12-cv-809
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Terence P. Kemp

## OPINION AND ORDER

This matter is before the Court on the parties' motions to review the Clerk's Memorandum as to Bill of Costs [ECF No. 276]. For the following reasons, Plaintiffs' motion [ECF No. 281] is **GRANTED** and Defendants' motions [ECF Nos. 279, 280] are **DENIED**.

### I.

This case was originally assigned to and decided by Judge Gregory Frost, who has retired. The undersigned is now assigned to this matter. Edward Peterson was arrested on misdemeanor charges and admitted to Franklin County Correctional Center II ("FCCC") on August 5, 2011. (Oct. 16, 2014 Op. & Order at 2 [ECF No. 242].) Upon intake at the FCCC, Peterson underwent standard medical screening. (*Id.*) Nurses took his vital signs and interviewed him about his medical history. (*Id.*) Peterson indicated that he had mental health problems but did not inform the nurses that he was taking any medications or that he suffered from any medical issues or injuries. (*Id.*) Unbeknownst to the prison officials at that time, Peterson suffered from congestive heart failure. (*Id.*) Peterson had also been diagnosed with bipolar and schizoaffective disorders. (*Id.*) He had been taking medication for his heart and mental health issues before he was arrested. (*Id.*)

The nurses conducting the intake process noticed that Peterson was answering questions inappropriately. (Oct. 16, 2014 Op. & Order at 3.) They therefore initiated medical observation. (*Id.*) Peterson was placed under "watch" from August 5, 2011, to August 8, 2011, during which time nurses checked on him every ten minutes (according to FCCC documentation). (*Id.*)

Peterson was transferred to an isolation cell on August 8, 2011. (Oct. 16, 2014 Op. & Order at 3.) Peterson remained in the isolation cell until he was found dead in it on September 4, 2011 (twenty-eight (28) days later). (*Id.*) Plaintiffs offered expert testimony that Peterson's heart condition caused him to gain "30 plus pounds of 'edema' fluid weight while he was in jail and prior to his death" and that Peterson's condition would have caused swelling of the extremities (often legs and feet) that would have made walking and caring for oneself difficult. (Suna Decl. at 1–2 [ECF No. 218-1].) The coroner listed Peterson's cause of death as heart disease. (Oct. 16, 2014 Op. & Order at 6.)

Shortly after Peterson's death, the Franklin County Sheriff's Office ("FCSO") initiated an internal investigation of the facts surrounding the incident. (Oct. 16, 2014 Op. & Order at 7.) A member of the FCSO conducted the investigation and wrote a report documenting his findings (the "IAB Report"). (*Id.*) The IAB Report recommended discipline for more than forty (40) deputies. (*Id.*)

In September 2012, the administrator of Peterson's estate, John C. Ruiz-Bueno, III, and Peterson's son, Michael Anthony Gay, brought a claim for Eighth Amendment violations under 42 U.S.C. § 1983, as well as state-law claims for negligent provision of medical care, wrongful death, and loss of consortium. (Oct. 16, 2014 Op. & Order at 2.) Plaintiffs named fifty-four (54) defendants in their action, most of whom were FCSO employees who worked in the FCCC section where Peterson was confined. (*See id.* at 2, 8; Am. Compl. at 2–6 [ECF No. 119].) In its

Opinion and Order on Defendants' motions for summary judgment, the Court dismissed Plaintiffs' claims against all but two individuals, Deputies Seth Nibert and Randall Hoar. (*See* Oct. 16, 2014 Op. & Order at 36–37.) On appeal, the Sixth Circuit partially reversed this Court, concluding that the Court should have granted summary judgment on all claims as to all Defendants, including Nibert and Hoar. (Sixth Circuit Decision at 2 [ECF No. 259].)

On remand, Defendant Douglas Edgington submitted a bill of costs [ECF No. 265] for $830.10. The other Defendants submitted a bill of costs [ECF No. 262] for $20,546.42. The Clerk disallowed all of Edgington's costs. (*See* Clerk's Mem. at 5 [ECF No. 276].) And as to the other Defendants, the Clerk allowed some costs and disallowed others. (*See id.*)

The parties have now moved for the Court to review the Clerk's decision. Defendants request the award of costs that the Clerk disallowed. Plaintiffs ask the Court to disallow the award of any costs.

## II.

Federal Rule of Civil Procedure 54(d)(1) states that costs "should be allowed to the prevailing party" unless a federal statute, the Federal Rules of Civil Procedure, or a court order provides otherwise. Fed. R. Civ. P. 54(d)(1). Rule 54(d)(1) codifies a presumption that prevailing parties are entitled to costs. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013). The decision whether to award costs is, however, ultimately left to the discretion of the district court. *Id.*

The Sixth Circuit has explained that the discretionary grant of costs under Rule 54(d) was "'intended to take care of a situation where, although a litigant was the successful party, it would be inequitable under all the circumstances in the case to put the burden of costs upon the losing party.'" *White & White, Inc. v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 730 (6th Cir. 1986) (emphasis deleted) (quoting *Lichter Found., Inc. v. Welch*, 269 F.2d 142, 146 (6th Cir. 1959)).

Several circumstances justify the denial of costs, including (i) where the prevailing party's taxable costs are unnecessary or unreasonably large, (ii) where the prevailing party unnecessarily prolonged trial or injected unmeritorious issues into the case, (iii) where the prevailing party's recovery is so insignificant that the judgment amounts to a victory for the defendant, and (iv) where the case is "'close and difficult.'" *Id.* (quoting *U.S. Plywood Corp. v. Gen. Plywood Corp.*, 370 F.2d 500, 508 (6th Cir. 1966)). When deciding whether to award costs, a district court may consider, among other factors, the losing party's indigency. *Singleton v. Smith*, 241 F.3d 534, 539 (6th Cir. 2001). The court should ignore, by contrast, the size of the prevailing party's recovery and the ability of the prevailing party to pay its costs. *White & White*, 786 F.2d at 730.

Plaintiffs argue that the Court should disallow the award of costs because, among other reasons, this was a close and difficult case and Michael Gay—the loss of consortium Plaintiff and son of Edward Peterson—has no ability to pay Defendants' costs. (*See* Pls.' Mot. to Review Costs at 3–9 [ECF No. 281]; Pls.' Reply in Supp. of Mot. to Review Costs at 1–2 [ECF No. 284].)

## A.     Closeness and Difficulty

The Court agrees that this case was close and difficult. "The closeness of a case is judged not by whether one party clearly prevails over another, but by the refinement of perception required to recognize, sift through and organize relevant evidence, and by the difficulty of discerning the law of the case." *White & White*, 786 F.2d at 732–33. The closeness and difficulty of this case is reflected in its fact-intensive nature and broad scope. The case produced over 12,000 pages of filings (prior to appeal) and entailed a close examination of the conduct of numerous deputies, supervisors, and medical professionals over the nearly month-long period that Peterson was incarcerated. The closeness and difficulty of this case is also reflected in the

Court's decisions. Plaintiffs' claims against Defendant Edgington survived judgment on the pleadings and the Court, prior to the Sixth Circuit's reversal, denied Defendants Seth Nibert and Randall Hoar's request for summary judgment. (Apr. 16, 2014 Op. & Order at 1 [ECF No. 174]; Oct. 16, 2014 Op. & Order at 36–37 [ECF No. 242].)

Defendants argue that this case was only difficult because Plaintiffs brought the case against too many people. (*See* Defs.' Reply in Supp. of Mot. to Tax at 1–3 [ECF No. 272].) Defendants may be right that Plaintiffs pleaded this case too broadly. But the case would have been difficult even if Plaintiffs had narrowed the pleadings. Peterson's declining condition and eventual death occurred over a twenty-eight (28) day period. (*See* Oct. 16, 2014 Op. & Order at 3.) During that time, numerous supervisors, deputies, and medical professionals had varying levels of interaction with Peterson. (*See id.* at 8.) And the IAB Report on Peterson's death recommended discipline for supervisors and more than forty (40) deputies. (*Id.* at 7–8.) Given the extensive time period in question, the broad scope of the IAB Report, and the IAB Report's conclusion critiquing the behavior of scores of FCCC personnel, the Court cannot conclude that this case would have been significantly less difficult if Plaintiffs had sued fewer Defendants.

**B.    Ability to Pay**

The Court also agrees that Gay has a limited ability to pay the requested costs. Gay states in an affidavit that he makes approximately $800 to $900 bi-weekly. (Gay Aff. ¶ 3 [ECF No. 284-1].) He has a wife and three young children. (*Id.* ¶ 4.) Each month he pays $595 in rent, approximately $450 in utilities, and approximately $250 on a vehicle lease. (*Id.* ¶¶ 8–9.) He owes several hundred dollars on a Macy's credit card. (*Id.* ¶ 10.) He pays some monthly childcare related expenses. (*Id.* ¶ 11.) And he is responsible for his personal medical expenses, with the exception of annual check-ups and limited coverage for emergency visits, until he meets his

$4,000 deductible. (*Id.* ¶ 6.) Gay does not own any stocks or investments, nor does Gay have any assets outside of family items and clothing. (*Id.* ¶¶ 5, 12.)

Defendants argue that Gay's inability to pay should not justify a denial of costs given that the second Plaintiff in this case, John C. Ruiz-Bueno, III, does have the ability to pay Defendants' costs. (*See* Edgington's Mem. in Opp'n at 2–3 [ECF No. 282]; Defs.' Mem. in Opp'n at 2–4 [ECF No. 283].) Plaintiffs do not dispute Ruiz-Bueno's ability to pay. They contend, however, that Ruiz-Bueno should not be held personally liable for Defendants' costs because he was acting in his capacity as the administrator of Peterson's estate and prosecuting the case for the exclusive benefit of Peterson's son, Michael Gay, and Peterson's minor daughter, Alexus Caldwell-Peterson. (*See* Pls.' Reply in Supp. of Mot. to Review Costs at 2, 7 [ECF No. 284].)

Ohio courts have not explicitly addressed whether a personal representative should be held personally liable for litigation costs. Nor has the Sixth Circuit. Nonetheless, statutes and case law addressing the personal liability of personal representatives and estate administrators indicates that Ruiz-Bueno should not be held personally liable for an award of costs.

Under Ohio law, a civil action for wrongful death must be brought "in the name of the personal representative of the decedent for the exclusive benefit of the surviving spouse, the children, and the parents of the decedent." O.R.C. § 2125.02(A)(1). A personal representative of the decedent is a court-appointed administrator or executor of the decedent's estate. *Mousa v. Mt. Carmel Health Sys., Inc.*, 10th Dist. Franklin No. 12AP-737, 2013-Ohio-2661, ¶ 11. "The personal representative is only a nominal party, and the real parties in interest are the beneficiaries of the decedent because they have suffered an injury." *Id.*; *see Toledo Bar Ass'n v. Rust*, 124 Ohio St. 3d 305, 2010-Ohio-170, 921 N.E.2d 1056, ¶¶ 21, 29.

Case law dealing explicitly with a personal representative's liability when bringing a wrongful death action is sparse. A person's potential liability for serving as an estate administrator is, by contrast, better developed under Ohio law. A judgment in a suit against an administrator for her actions in that capacity generally must be against the estate's property—not the administrator's. *See Heirs of Waldsmith v. Adm'rs of Waldsmith*, 2 Ohio 156, 159 (1825). This general rule has several exceptions. Administrators may be held personally liable if they do not fulfill their duties in good faith. *Sullivan v. Morgan*, No. 90AP-1417, 1991 WL 115872, at *4 (Ohio Ct. App. June 20, 1991) ("An act of the administrator which results in a breach of trust, a misappropriation of estate assets, mismanagement of the estate, or other neglect of duty is actionable and may result in a charge against the administrator *de bonis propriis*, which is a judgment against an administrator to be satisfied from his own property."). Administrators face personal liability if an individual relies on a promise that they make after the testator's (or intestate's) death. *See Heirs of Waldsmith*, 2 Ohio at 159–60. Administrators may be held personally liable for the services of attorneys employed by them, even if the services are rendered for the benefit of the estate. *Thomas v. Moore*, 39 N.E. 803, paragraph two of the syllabus (Ohio 1894). And administrators may be personally liable if they prematurely distribute estate assets. *See* O.R.C. § 2113.53(C).

Here, Ruiz-Bueno sued Defendants in his capacity as the administrator of Peterson's estate. (*See* Am. Compl. at 1 [ECF No. 119]; Ruiz-Bueno Aff. ¶ 24 [ECF No. 284-2].) Defendants have not argued that Ruiz-Bueno fulfilled his administrator duties in bad faith, that he should be required to pay for the services of an attorney he hired, or that he prematurely distributed estate assets. Nor do Defendants argue that they relied on a promise that Ruiz-Bueno made after Peterson's death. Defendants have not asserted, in other words, that any of the

exceptions to the general rule of administrator personal liability apply. Under these circumstances, any award of costs should be paid by Peterson's estate (or the other Plaintiff in this action, Michael Gay)—not Ruiz-Bueno. *See Heirs of Waldsmith*, 2 Ohio at 159.

Defendants argue that Ruiz-Bueno should be held personally liable for the costs in this case, irrespective of his role as estate administrator, because the "choice to initiate and pursue wrongful death litigation is that of the administrator alone." (Defs.' Mem. in Opp'n at 2.) Ruiz-Bueno, however, has clarified in an affidavit that he did not make the decision to initiate this lawsuit and that he "maintained relatively no, or at the most *de minimis*, involvement in the litigation." (Ruiz-Bueno Aff. ¶¶ 18, 24 (stating that "the attorneys for the wrongful death case had already entered into an agreement with the beneficiaries to file suit for their benefit, but they could not do so without meeting the formality required by O.R.C. 2125.02(A)(1) that an administrator be involved").) Indeed, under Ohio law, a personal representative of the decedent is a nominal party to a wrongful death suit. *See Mousa*, 2013-Ohio-2661, ¶ 11; *Toledo Bar Ass'n*, 2010-Ohio-170, ¶¶ 21, 29. And in any event, even if Ruiz-Bueno had chosen to initiate this lawsuit, his decision would not change the general rule that a judgment against a person acting in his capacity as an administrator generally must be paid by the decedent's estate. *See Heirs of Waldsmith*, 2 Ohio at 159.

Defendants also point to a case from the Western District of Virginia in which the court concluded that an administrator could be held personally liable for the defendant's costs in a wrongful death action. *See Norris v. Excel Indus., Inc.*, No. 5:14-cv-29, 2016 WL 1092706, at *2 (W.D. Va. Jan. 26, 2016). *Norris* is not controlling law. Moreover, it is factually distinct from the present case. Unlike Ruiz-Bueno, the administratrix in *Norris* was both the administratrix of the decedent's estate and, crucially, a statutory beneficiary of the decedent. *See id.*

8

## III.

Given the close and difficult nature of the case, Plaintiff Gay's inability to pay the requested costs, and the lack of assets in Peterson's estate, (*see* Pls.' Mot. to Review Costs at 3–9 [ECF No. 281]), Plaintiffs' motion [ECF No. 281] to review the Clerk's taxation of costs is **GRANTED** and Defendants' motions [ECF Nos. 279, 280] are **DENIED**. Defendants' costs are all **DISALLOWED**.

**IT IS SO ORDERED.**

_9-27-2017_
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**